Anderson, J.
There can be no doubt that the contract upon which this suit was brought, dated June 1st, 1863, was entered into with reference to Confederate money as the standard of value, and that according to the true understanding and agreement of the parties, it was to be fulfilled and performed in that cuiTeucy. It was a contract in writing under seal for the sale of one hundred head of cattle, from three to two years old— mostly two years old—by the defendant in error to the intestate of the plaintiff in error, with the privilege to-the purchaser of pasture on the farm of the former for as many of them as he thought might do well, until the 1st *524 of October following, for the sum of $75 per head “in current funds, to be paid to the said Ervin when he demands the same; however, said price for said cattle is not to draw interest until after a ratification of a treaty of peace between the United States and Confederate States governments.” The contract does not specify any time for payment, but binds the purchaser to pay when Ervin “demands the same.”
This is a contract, in .effect, to pay in pros send. To pay when the seller “demands the same” is, in legal effect, the same as to pay on demand. Stover Assignee v. Hamilton & al., 21 Gratt. p. 273. And it seems to have been so understood by the parties; otherwise they would not have deemed it necessary to make the stipulation which relieves the purchaser from the payment of interest from the date of the articles. And that stipulation, whilst it implies that the parties contemplated that it might not be paid until after the war then raging had terminated, does not imply that it was contemplated by the parties that it would be payable in any other currency than that of the Confederate States. For it shows that the parties looked to the termination of the war by treaty between the government of the Confederate States, as a sovereign power, and the government of the United States; from which it may be fairly inferred that the intention and expectation of the parties were that payment was to be made in Confederate currency, whether made before or after the termination of the war. This appears to have been the contract, as shown by the face of the instrument, and it is not contravened, but confirmed, by the parol evidence and the surrounding circumstances.
It is fully confirmed by the facto certified by the court of trial, as proved by Seig, the scrivener, who draughted the article of agreement, and was the only subscribing witness, who was present at the negotiations between the parties and heard all that passed. Uor is it invali *525 dated by the facts proved by the witnesses, George A. Mays and ¥m. Eoss, as also certified by tbe court. By the last it is proved that, in a conversation which he had with McOlung in the latter part of June .1868, the latter said that he was to pay for the cattle at the rate of $75 a head in the currency of the country after the war; and from what he said, witness understood that he expected to pay in Confederate currency. This evidence, though it is not so full nor so clear, is not at all in conflict with the evidence of Seig, nor with the import of the written agreement as construed. From the latter, it is evident that the parties contemplated that payment might be made after the war, and McClung may well have concluded that it would not be made until after the war. But as we have seen, the terms of the article imply that in that case it was to be paid in Confederate money. And this comports with the statement made by McClung to Mays. But it more clearly appears from the facts certified, as proved by Seig— as for instance, the statement, among others which might be mentioned, that McClung “was very reluctant to enter into the contract, fearing some difficulty about it, but that his objections were met by the assurance of said plaintiff that he would take the Confederate notes whenever he made his demand, whether the same was before or after the close of the war.” This view is also explanatory of the seeming conflict of the testimony of ¥m, Eoss.
Nor does the conversation detailed by the witness Mays, on his second examination, raise a question of credibility between him and the witness Seig. He says that in the course of the conversation between him and McClung, in the summer or fall of 1865, the latter said, “that things had turned out differently from what anybody expected; that he was bound to pay the plaintiff in the currency of the country; that he had not made much or lost much, as he had used the money paying *526 old debts with it.” Admitting this conversation to have been correctly understood, remembered and detailed by the witness, it is not necessarily in conflict with the facts proved by Seig and implied by the written agreement. Both may be true, and the contract have been such as the article of agreement, more fully and clearly explained by Seig, shows it to have been. It only proves that soon after the war, when everything was in great confusion and uncertainty, before any act for the adjust-, ment of Confederate contracts was passed by the Legislature, the intestate of the plaintiff in error met the witness in the road, his mind greatly disturbed with the condition of the country, “things having turned out differently from what anybody expected,” and suffering at the time from the disease of which he soon after died, he made the remarks attributed to him. He expresses the opinion, or fear, that he was now bound to pay this debt in the currency of the couutry, but consoles himself by saying that he had not made much or lost much, as he had used the money in paying old debts with it; when the fact was, as certified by the court of trial, that the money he had received for the cattle he purchased from Ervin had all perished; and moreover, that in 1863 he was free from embarrassment and had abundant means at his command. The fact of this conversation, as proved by Mays, only shows that this troubled, suffering man was as mistaken in the grounds of his fears as to the obligation of his contract, as he was in the grounds of his consolation that he had used the money in paying old debts. And it appears that for the only purpose for which it was introduced,, to show that McClung himself did not regard the contract as entered into with reference to Confederate treasury notes as the standard of value, or as solvable in that currency, it was rejected by the jury in their verdict, and by the court in its judgment, as entitled to no weight, for both are predicated of a Confederate contract-. We do not-, there *527 fore, in reviewing this verdict, impinge the doctrine that it is the province of the jury to weigh the testimony, when we hold that such evidence ought not to weigh against the evidence of the subscribing witness and the written agreement, for in so holding we are evidently iu harmony with the jury and the court of trial.
That it was a contract made with reference to Confederate currency as the standard of value, and according to the true understanding and agreement of the parties was solvable in that currency, may be implied from the following facts: that both the contracting parties were citizens of the Confederate States, and recognized the existence and authority of the Confederate government— one of them, Ervin, being then under marching orders to maintain its authority by the sword ; that the place where the contract was made was within the territorial jurisdiction and power of that government, and recognized no other adverse to it; that Confederate currency then and there filled all the channels 'of circulation, and was received and paid out by both State and Confederate governments, and by the banks and individuals in all ordinary transactions—-facts of public history; and that the price agreed to be paid for the cattle was not such as would have been paid in gold, being a high price, payable in Confederate money, at that time, according to the proof in the record: and these are strongly confirmatory of the facts proved by Seig and the construction given to the written agreement.
But it is contended that the bill of exceptions is not well taken, and cannot, therefore, be regarded by the appellate tribunal. It is certified that each fact and circumstance stated in the bill of exceptions was proved, and in conclusion, that these were “all the facts proved.” It appears, therefore, that it was the intention of the judge of the court of trial to certify what was, in his opinion, proved, and not merely what was testified, by the witnesses; and consequently, no issue as to the credi *528 bility of witnesses is submitted by the bill of exceptions to the appellate tribunal. Therefore, upon the authority of repeated decisions of this court, which it is unnecessary to review, the bill of exceptions is well taken. I refer to Ewing v. Ewing, 2 Leigh, 337; Carrington v. Bennett, 1 Leigh, 340; and Green v. Ashby, 6 Leigh, 135. In this last case Brockenbrough, J. says: “Itis well known that in trials before a jury circumstances are every day given in evidence which do not, of themselves, prove the fact which is in issue, but the fact itself may be inferred from those circumstances. The circumstances proved are facts, and the deduction to be drawn from them is also a fact. There is, then, a distinction between circumstantial facts and inferred facts. If there be no contradiction in the circumstances given in evidence, the appellate court may judge of the inference to be drawn as well as the trying court.” Again he says, referring to the case of Carrington and Bennett: “If the trying court had contented itself with merely certifying the fact which it inferred,n there would have been no mode of correcting the error of an improper inference deduced from admitted and proved facts, and there would have been no use whatever in signing a bill of exceptions in which the inferred fact was alone inserted.” Cabell, J., said: “In such case it is competent to this court, and it is its duty, to deduce from the testimony all such inferences of fact as the jury might have deduced from it.” And Tucker, P., said; “All that the rule (in Bennett v. Hardaway) requires is, that the appellate tribunal be absolved from the decision of the question, whether the testimony is true or untrue.” Aud when the bill of exceptions states, as it did in Carrington v. Bennett, “ that the witness proved so and so,” and that “ these were all the facts proved in the cause,” this court must take it that the matter stated was proved to the satisfaction .of the jury.
In Patterson v. Ford, 2 Gratt. 19, there was a question *529 as to the credibility of the witness, and the certificate, after setting out the evidence, concluded, “and this being all the evidence in the cause.” And whilst Baldwin, J., in delivering his opinion, intimates that Carrington v. Bennett was not authoritative, because the decision of a divided court of three judges, he expressly says it was not in point, there being no shadow of imputation there against the witness, and the certificate concluding “these being all the facts proved in the cause.” But it is directly in point here. And although it was the decision of a divided court of three, Cabell, J., who did not sit in that case, says in Ewing v. Ewing, which was decided shortly afterwards, that he approved of it, after having attentively considered it. And it is sanctioned and re-affirmed by a majority of the whole court, in Green v. Ashby, supra. And in the recent case of Gimmi v. Cullen, 20 Gratt. 450, it is recognized as authority. In that case it was held that the bill of exceptions was not well takeu. And in assigning the reasons, Joynes, J., speaking for the court, says, “The language of the bill of exceptions, however, indicates that the intention of the court was to certify the evidence, and not the facts. It says the court certifies the following as the evidence in the cause.” “Bobert A. Lancaster deposed as follows.” It says the other witnesses also introduced by the plaintiff “ testified, ^-c.” In this case (he further says), there is no statement, as in Carrington v. Bennett for instance, that £ £ these were all the facts proved;” nor any other expression to impair the force of the other words, and throw doubt upon the character of the certificate.” Again, on p. 455 he says, He must have a certificate of the facts proved, or a certificate that the evidence was considered true by the court of trial; which w’ould amount to a certificate that the facts stated in the evidence, were really facts proved. Brom the evidence certified in the former case, and from the facts certified in the latter, the appellate court will *530 draw such inferences as a jury might reasonably draw.” I conclude, therefore, that a bill of exceptions is well taken, though the evidence is stated in detail, if it is certified by the judge as facts proved, and is’not materially conflicting, and there is no impeachment of the witnesses. As was said by Brockenbrough, J., in Green v. Ashby, evidence admitted-to be true, is in nowise different from facts proved.
I am of opinion, therefore, that upon the certificate of facts proved in this cause, it is competent to this court, and it is its duty, to review the judgment of the court of trial overruling the motion to set aside the verdict, and grant a new trial; and that upon a review of the facts certified, the contract upon which the suit is founded was, according to the true understanding and agreement of the parties, to be fulfilled and performed in Confederate treasury notes. This being so, is the verdict of the jury contrary to the evidence and the law ?
It is true, as was said by Baldwin, J. in Patterson v. Ford, supra, -that whilst the court may grant a new trial where the verdict is contrary to law arid evidence, the duty of doing so is not always imperative ; as where the verdict is adverse to a bard and -unconscionable action- or defence, or where it conforms to the substantial justice or equity of the case. In such cases the court may refuse to set aside the verdict and grant a new trial, although •it is not warranted “by close deduction, or rigid analysis, or strict adherence to legal principles. The books are full of such cases, and the idea has been carried to great lengths, in oppressive or iniquitous actions or defences.” But the power will be exercised, where it seems to be required, as in this case, in order to prevent gross injustice.
The court below was satisfied from the evidence, that the parties contemplated that the contract was to be fulfilled in Confederate States treasury notes after the war, that the Confederate States would then be established, *531 and the said notes would he the currency of an established government; yet in the judgment of the court, the contract was impossible of execution, by the .course: of events, as originally intended. If the contract as made by the parties, was impossible of execution according to the intention of the parties, could it be enforced at all, without making a new contract for them? is a question .which naturally arises ; but upon which I give no opinion, as it is unnecessary to the decision of the cause, and this court may not be fully in possession of the facts bearing upon that question, it not having been made in the court of trial. But however that may be, I think it is very clear, that in no aspect of the case, as presented by the record, is the defendant in error entitled to recover more than the value of the Confederate treasury notes, at the date of the sale, that being the date also of payment. Does the verdict exceed that value ?
There are two modes prescribed by statute, by which the value of the Confederate money contracted to be paid, can be ascertained, when the cause of action grows out of a sale, or renting or hiring of real or personal property. One, by reducing the value to gold ; the other, by the value of the property sold, rented or hired, in gold, at the date of the sale; as recently decided by this court in Pharis v. Dice, 21 Gratt. 307. In this case the jury seems to have adopted neither standard, but to have assessed the damages arbitrarily, without regard to any rule, but most probably as a compromise, if not capriciously. They allowed the plaintiff just half the amount of his claim.
The proof is that the value of Confederate money, at the date of the contract, in relation to gold, was from seven to eight for one. By that standard the value of $7,500 of Confederate money as of the date of the contract, taking the highest value, was a fraction over $1,071; and taking the lowest, was only $t)37.50 ; and yet the verdict is for $3,750. If there was”no proof as *532 to the value of the property at the date of the sale, or no satisfactory proof, the jury could only adopt the gold standard; I know of no alternative. The evidence in this cause furnishes no other criteria. There is no direct proof as to the value of the cattle, at the date of the sale. Indeed, there had been no sales for gold in that section, during that season. The proof is, that such cattle, for four or five years next preceding the war, were on the 1st day^of June of each year, worth from $18 to $20 per head. And it was proved that in the fall of 1864, the Confederate government, had purchased cattle in a neighboring county, at $20 a head in gold, which would have weighed at least one hundred» pounds a head more than the cattle bought by McClung from Ei’vin, which were proved to have weighed in the fall, after they had been-taken from pasture, an average of seven hundred and forty-nine pounds and a fraction—say seven hundred and fifty pounds. ’Putting the cattle bought for gold in 1864, at eight hundred and fifty pounds they were purchased at about two and one-third cents per pound in specie. At that price the Ervin cattle were worth in gold, according to their weight, after having had the benefit of the summer pasture, $17.50 a head; which is a little less than the estimate of such cattle before the war. Put them at $20, the highest price for such cattle before the war, in that neighborhood, and the verdict should not have exceeded $2,000.
But the verdict greatly exceeds that. I am therefore of opinion, that the damages allowed by the jury are excessive, and that the verdict is plainly contrary to law and evidence ; and that the judgment of the court below should be reversed, the verdict set aside, and a new trial directed.
Christian, Staples, and Bouldin, Js., concurred in the opinion óf Anderson, J.