# Richmond.

## GREEN'S ADM'R ET ALS. V. THOMPSON ET ALS.

### JANUARY 20th, 1888.

1. PERSONAL REPRESENTATIVES—*Application of payments.*—Where same person is representative of both debtor and creditor estate, he may out of funds in his hands belonging to former estate pay a debt due him as representative of latter estate. *Caskie* v. *Harrison,* 76 Va., 85.

2. IDEM—*Liability—Slaves—Emancipation.*—Where other personal assets besides slaves, existed largely in excess of the debts, administrator was not at liberty, under Code 1849, ch. 130, § 17, to sell the slaves, and hence not liable for their loss by emancipation.

3. IDEM—*Accounts—Surcharge and falsification.*—*Ex parte* settlements of administration accounts returned, approved, and recorded, are deemed *prima facie* correct, and a bill to surcharge and falsify must specify wherein they are erroneous, and the specifications must be sustained by evidence. *Newton* v. *Poole,* 12 Leigh, 112; *Corbin* v. *Mills,* 19 Gratt., 438. *A fortiori,* when an injunction is awarded that interferes with the administration of the deceased administrator's estate.

4. IDEM—*Separate distributee accounts.*—Where the accounts intelligibly show what administrator received, what he paid out, and when and to whom he paid it, objection that separate distributee accounts are not stated, has no force.

5. IDEM—*Lapse of time—Knowledge of heirs—Case at bar.*—Bill to surcharge and falsify *ex parte* settlements, is filed twenty-five years after death of administrator whose acts are complained of, but whereof the heirs were cognizant, and seventeen years after his accounts were closed by subsequent administrators:

HELD:

The lapse of time should be treated as a bar to the suit.

6. IDEM—*Appraisement and inventory.*—Where neither first administrator, (plaintiff's father) nor his successors had filed appraisement or inventory:

HELD:

  If loss resulted thereby to the estate, it furnished of itself no ground
  for relief against the subsequent administrators.

Appeal from decree of circuit court .of Culpeper county,
rendered June 8th, 1885, in the chancery suit wherein Samuel
W. Thompson, in his own right, and as administrator of
George C. Thompson, deceased, was complainant, and J.
Ambler Brooke, administrator *d. b. n.* of John Cooke Green,
deceased, Anne S. Green, executrix of James W. Green,
deceased, B. Pulliam, administrator of F. J. Thompson,
deceased, and others, were defendants.   The object of the suit
was to enjoin a sale of certain land under a trust deed, and to
procure a re-settlement of certain administration accounts.
The decree being adverse to the administrator of J. C. Green
and the executrix of J. W. Green, they obtained an appeal and
*supersedeas.*   Opinion states the case.

*A. McD. Green, G. D. Gray,* and *Christian & Christian,* for
the appellants.

*D. A. Grimsley, J. G. Field,* and *Jas. Lyons,* for the appellees.

RICHARDSON, J., delivered the opinion of the court.

In the year 1855, Francis J. Thompson died intestate, in the
county of Culpeper, leaving a widow, Martha H. Thompson,
and two sons, Francis J. Thompson, Jr., and George C. Thomp-
son, his only heirs and distributees.   The intestate is described
as a retired merchant, who lived on the interest of his money,
which was invested—a small portion in State and railroad
stock, but mainly in the bonds and notes of his friends and
neighbors in the county of Culpeper, amounting in the aggre-
gate to about the principal sum of $21,000.   He also owned
seven slaves, valued at some $5,000, and some household and

kitchen furniture; this being all his personal property. He owned at his death a house and lot in the town of Culpeper. Soon after his death, which occurred in 1855, his son, George C. Thompson, qualified as his administrator in the county court of Culpeper county, and gave bond with the requisite security in the penalty of $52,000, indicating that at that time the personal estate amounted in value to about $26,000, the practice and rule then and now being to require bond in a penalty at least double the amount to be administered.

George C. Thompson, the first administrator, failed to have an appraisement, and returned no inventory of the personalty which went into his hands as administrator. The settled accounts show that this administrator, after holding his trust for a little over one year, during which time he sold the household and kitchen furniture, collected and disbursed $5,052 76 of the assets which went into his hands, and resigned his trust. And in 1856, John Cook Green qualified as administrator *de bonis non* of said intestate, and gave bond as such, in the penalty of $32,000, indicating that the property or assets that went into his hands were estimated at about $16,000. The record shows that he made annual settlements of his administration accounts, paying the debts of the intestate and making various advancements to the distributees. These settlements were regularly made before one of the court's commissioners, confirmed by the court according to law, and recorded, no exception having ever been taken to any one of such accounts. After exercising the trust reposed in him as administrator for four years, J. C. Green died in June, 1860. By reference to his said settled accounts, it appears that he, during the period of his administration, paid to the creditors and distributees the sum of $12,500; and by the last settlement of his accounts, made after his death by his administrator, James W. Green, there was found to be due from the estate of the intestate, Francis J. Thompson, to the estate of John C. Green, as of April 4th, 1860, the sum of $4,571 72. This settlement was

made in 1860, was confirmed and duly recorded, and its correctness has remained unquestioned and in no way impeached from its date down to the institution of this suit in September, 1884, a period of more than twenty-five years.

The duties of J. C. Green, as administrator *de bonis non* of Francis J. Thompson, having terminated at his death as aforesaid, in July, 1860, James W. Green duly qualified as administrator *de bonis non* of said intestate, Francis J. Thompson, and gave bond in the penalty of $20,000. And said James W. Green and George Morton qualified as executors of said John C. Green, deceased. Thus there were three successive administrators of the personal estate of Francis J. Thompson. The evidence in the record shows that the only assets belonging to the estate of the intestate, Francis J. Thompson, which went into the hands of his third administrator, James W. Green, were these: 1st, A bond of Henry Shackelford to said F. J. Thompson for $2,609 13; 2d, A bond of Judge Richard H. Field, originally for $4,000, subject to a credit of $1,000 of the principal, collected by J. C. Green, leaving of principal due, $3,000; 3d, A bond of R. G. Ward, secured by deed of trust on W. P. Newby's land for $2,831 83, with interest from July, 1857, subject to a credit of $1,000 paid J. C. Green September 17th, 1857, $1,831 83.

These debts, especially the one first named, the Shackelford debt, constitute the focal point of controversy in this suit. Some of the interest on two of these debts was collected by James W. Green; and he paid out to the creditors and distributees of his intestate, F. J. Thompson, about $900 in money, and he assigned the Shackelford bond to the estate of J. C. Green in discharge of the debt due the latter estate as aforesaid, from the estate of F. J. Thompson, (presently to be more particularly referred to) the $900 thus paid out by James W. Green, administrator, and the Shackelford bond assigned by him as aforesaid, making the aggregate sum paid out by him during his administration of $5,500. He also made several

settlements of his administration accounts before the proper commissioner, and these were duly confirmed by the court and recorded.   These settlements show a balance due the administrator July 17th, 1881, of $904 99.   James W. Green, the third administrator, died in April, 1884.

It thus appears by the record that the aggregate amount disbursed by the three administrators of F. J. Thompson, deceased, to his creditors and distributees, was $23,800, of which $18,000 was paid out by his first two administrators in less than five years after the intestate's death, and this out of an estate of the estimated value, in 1855, exclusive of the slaves, of $21,000.

In the view of the case, as above stated, the unadministered assets of said estate consist now of only the Field and Newby bonds, amounting in principal alone to the sum of $4,831 83. To this sum add the aggregate amount of $23,800 paid out by the then administrators, and we find that the sum of $27,800 of the assets of said estate are clearly accounted for by those administrators, exclusive of the slaves.

It has already been stated, that one of the bonds which constituted the assets that went into the hands of James W. Green, as administrator of F. J. Thompson, was the bond of Henry Shackleford to said Thompson for $2,609 13, which was secured by a trust deed on a tract of land of 414 acres, known as "Cleveland."   The deed securing this debt was dated November 24th, 1845; and other debts were secured thereby.   Under this deed the land (Cleveland) was sold in 1867, and M. G. Shackleford and Lucy B. Shackleford, daughters of Henry Shackleford, became the purchasers, and the land was conveyed to them.   On the day of their purchase (21st November, 1867,) James W. Green, administrator of F. J. Thompson, took the bond of said M. G. and Lucy B. Shackleford for the sum of $4,002 62, which was the amount of the original bond of Henry Shackleford to said Thompson, together with the accrued interest to March 23d, 1866, and M. G. and L. B. Shackleford

secured this bond by a deed of trust on said land, dated 21st November, 1867. And on the 23d of November, 1867, said James W. Green, administrator as aforesaid, transferred this bond to himself, as executor of John C. Green, in payment of the debt of $4,571 72, due from F. J. Thompson's estate to the estate of John C. Green, before referred to; and said James W. Green credited the estate of his intestate by the amount of said Shackleford bond, and charged said estate with the payment, by said transfer of said debt, which became thus a part of the assets of the estate of J. C. Green, all of which appears by the settlement of the administration accounts of James W. Green, who was the administrator of F. J. Thompson, and also one of the executors of J. C. Green, deceased.

James W. Green had, in a previous settlement of his account as administrator of F. J. Thompson, charged the estate of Thompson with the sum of $250, paid to himself as executor of John Cook Green, deceased, on account of said indebtedness of said Thompson's estate to the estate of said John Cook Green, as appears by a settlement of James W. Green's account as administrator of F. J. Thompson. The transfer of the Shackleford bond was on account of the balance due on said indebtedness.

George C. Thompson, one of the heirs and distributees of Francis J. Thompson, died in 1874, leaving a widow, S. Hood Thompson, and a son, Samuel W. Thompson, his only heirs and distributees. And, in 1881, said Samuel W. Thompson procured from Francis J. Thompson, Jr., Mrs. Martha H. Thompson, and S. Hood Thompson an assignment of all their interests in the estate of said Francis J. Thompson, deceased, by which assignments Samuel W. Thompson became the sole distributee of the estate of his grandfather, the said Francis J. Thompson, deceased. And, in December, 1883, the said Samuel W. Thompson sold and assigned all his interest in said estate to A. McD. Green. In April, 1884, James W. Green died, and Anne S. Green, his widow, qualified as his executrix

and J. Ambler Brooke qualified as administrator *de bonis non* of John Cook Green, deceased. In September, 1884, at the instance of said J. Ambler Brooke, administrator of J. C. Green, James G. Field, the trustee in the deed of trust of 21st November, 1867, from M. G. and L. B. Shackleford, before referred to, advertised the tract of land called "Cleveland," therein conveyed, for sale at public auction, to pay the aforesaid Shackleford bond of $4,002 62, which had been transferred as aforesaid by James W. Green, administrator of F. J. Thompson, to himself as executor of John C. Green, deceased.

Soon after the advertisement of the land for sale under the trust deed, Samuel W. Thompson filed his bill in the circuit court of Culpeper, in his own right and as administrator of his father, George C. Thompson, deceased, against the said James G. Field, trustee, Anne S. Green, executrix of James W. Green, deceased, J. Ambler Brooke, administrator of John C. Green, deceased, A. McD. Green, Francis J. Thompson, Jr., and Martha H. Thompson and others, defendants, praying that the sale of said land by the trustee be enjoined, "that the said assignment of the Shackleford bond for $4,002 62, from said J. W. Green, administrator as aforesaid, to himself as executor of John C. Green, be set aside and annulled; and that the sale of complainant's interest in said estate of F. J. Thompson to said A. McD. Green be also set aside; and that the said J. C. Green's estate and James W. Green's estate might be required to account for the many thousands of dollars of personal property of the estate of F. J. Thompson, deceased, which came into their hands either as attorneys or administrators, or assignees; that said Anne S. Green, executrix of James W. Green, be required to render an account of the actings and doings of said James W. Green, administrator of said F. J. Thompson, giving a list of all the personalty and choses in action of said F. J. Thompson which went into his hands; that said Green's estate be subjected to the payment of the Field and Newby debts, and the full amount of the value

of the said slaves and all other debts lost unto said estate by the laches and negligence of said administrator; and that all necessary and proper accounts be taken, &c., and for general relief."

The injunction was granted according to the prayer of the bill, restraining the trustee from making sale of the land. And at the November term, 1884, of the circuit court of said county, Anne S. Green, executrix of James W. Green, deceased, J. Ambler Brooke, administrator of John C. Green, deceased, and A. McD. Green filed their general demurrers and answers to the bill; and with their answers they filed as exhibits certified copies of the settled accounts of John C. Green and James W. Green as administrators of F. J. Thompson, which had been regularly confirmed by the court and ordered to be recorded. Said answers also deny each and every material charge contained in the bill. James G. Field, trustee, also answered, showing that he was simply proceeding to execute the trust according to its terms when the injunction was granted. J. C. Gibson demurred to, and answered the bill, and his wife also answered; but their answers disclose nothing material to the cause.

Numerous depositions were taken touching the validity of the assignment by Samuel W. Thompson of all his interest in the estate of his grandfather, F. J. Thompson, to A. McD. Green; but, as stated in the petition for appeal, these depositions do not appear in the record, as that question was settled by the voluntary surrender of said assignment by the assignee, A. McD. Green, to the said S. W. Thompson.

The cause was heard on the 8th of June, 1885, upon the bill and answers, and demurrers, exhibits, depositions, and other evidence; and upon the motion of the defendant, J. Ambler Brooke, administrator, &c., to dissolve the injunction awarded in the cause. And the court decreed as follows:

"On consideration whereof, the court declining at this time to dissolve said injunction, and being of the opinion that under

the circumstances of this case lapse of time and death of parties do not bar the complainant from having ordered a settlement of the fiduciary accounts, mainly because the court does not consider that such an account has ever been properly settled, doth adjudge, order and decree that it be referred to one of the master commissioners of this court to take, state and report an account of F. J. Thompson's several administration accounts by his several administrators, and also a distributee account of said F. J. Thompson's estate, showing what sums are properly chargeable to each; in stating which accounts said master commissioner is instructed to accept as true the items of payments to the widow and distributees, and to all other items of the *ex parte* accounts settled by said several administrators, except James W. Green, and except such as appear on their face to be erroneous, the court being of opinion that after the lapse of time it would be improper to permit the distributees of Francis J. Thompson, deceased, to question the items of payment to them; said master commissioner is authorized to make alternate statements of said account, so as to fully represent different views."

From this decree, J. Ambler Brooke, administrator *d. b. n. c. t. a.* of John Cook Green, deceased, and Anna S. Green, executrix of James W. Green, deceased, obtained from one of the judges of this court an appeal and writ of *supersedeas.*

After a careful and pains-taking examination of the record in this case, we are clearly of opinion that the decree of the court below is manifestly erroneous in every particular as to which it is complained of.

The first error assigned by the appellants is to the action of the circuit court in refusing to dissolve the injunction granted the complainant on the 23d of September, 1884, prohibiting the sale of the farm (Cleveland) under the trust deed of November, 1867, to pay the debt thereby secured of $4,002 62, which debt had as already stated, been transferred by James W. Green, the successor of John Cook Green, as administrator of

F. J. Thompson, to himself as executor of said John Cook Green, deceased, in payment of the balance of the debt of $4,571 72, due by said Thompson's estate to the estate of said J. C. Green, deceased, as shown by the settled, confirmed and recorded account of said Green as administrator of said Thompson of April 4th, 1860.

In the complainant's bill, this transaction is assailed as invalid on several grounds—not one of which is by any means tenable:

1st. It is alleged that no debt was due from said Thompson's estate to that of his deceased administrator, the said John C. Green, because, first, while the settled accounts of said Green, as administrator of said Thompson, show said sum of $4,571 72 to be due from the estate of the latter to the estate of the former, yet the debt was not really due as aforesaid, because, as it is alleged, said J. C. Green as *attorney* for the heirs and distributees of said F. J. Thompson, had sold a house and lot in the town of Culpeper, in 1859, belonging to said Thompson's estate, for $4,000, had received the money and had never accounted therefor.  This is a charge of fearful import, not only as utterly inconsistent with the relations of attorney and client, but especially as touching the memory of John Cook Green, against whom it is made, and who is proved by the record to have lived and died in the enjoyment of a very high character, both as an attorney and as a man.  F. J. Thompson, Jr., a son and one of the distributees of the intestate, and a witness introduced on behalf of the complainant, testifies unequivocally that John C. Green was held in very high esteem; and he further testified that he never, until the beginning of this suit, heard it intimated that John C. Green owed the estate of F. J. Thompson, deceased, a large amount of money, or anything, or that he had collected money for his heirs which he had not accounted for.  So that instead of sustaining the charge, the complainant's own witness practically disproves it.  In fact, not only is the charge not supported by

any proof whatever, but a careful scrutiny of the record fails to disclose a single fact or circumstance that even remotely tends to sustain it.

2d. The validity of the debt of $4,571 72, due from the estate of the intestate to that of his deceased administrator, John C. Green, is assailed on the ground that said Green received, as administrator of said estate, large amounts of various unnamed and unknown debtors, for which he had not accounted. In the bill, after referring to the Shackleford, Field, and Newby debts, and charging that John C. Green, administrator, committed a *devastavit* in failing to collect them before the war, when they might have been collected, it is then alleged against said Green as follows: "He also failed to collect other large debts, of the amounts of which, and by whom due, your orator is entirely ignorant." Surely it cannot be necessary to adduce arguments or cite authorities to prove that such an allegation and charge as this can afford no ground for ripping up and unsettling long settled fiduciary accounts.

3d. It is next alleged by way of impeaching the correctness and justness of this debt due from the intestate's estate to the estate of his said administrator, John C. Green, that said Green failed to sell the slaves belonging to the estate; by reason whereof they were emancipated as a result of the war, and were lost to the estate. And the complainant insists in his bill that the estate of John C. Green should be held responsible for this loss. It is only necessary to say that this charge, under the circumstances of the case, scarcely deserves to be dignified by notice. By section 17, chapter 130, Code 1849, this administrator was absolutely forbidden to sell the slaves, unless the rest of the personal estate of the decedent was insufficient to pay the debts. In this case, the debts of the estate were insignificant, and the administrator was, therefore, without authority to sell them. Moreover, it sufficiently appears that by arrangement between Mrs. Thompson and the other two distributees, the slaves were turned over to her,

except perhaps one, and she took them with her to the State of Maryland where they remained until emancipated by the result of the war.

The debt of $4,571 72, due from the estate of the intestate, F. J. Thompson, to the estate of John Cook Green, is also assailed in the bill as invalid on the ground that said Green, as administrator, failed to sue for and to collect the Field and Newby debts, before referred to, which, it is alleged, he might have done by the exercise of due diligence. In response to this charge, it is sufficient to say, it conclusively appears by the written requests of the distributees of the intestate, and by the deposition of F. J. Thompson, Jr., one of said distributees, taken by the complainant, that John C. Green, the administrator, was directed not to collect the principal of said debts, but to hold the same as investments for the intestate's widow, Mrs. M. H. Thompson. The said Shackleford debt was, by the distributees, requested to be similarly kept; but the interest on the debt not being promptly paid, and it being the interest on these debts which was intended to be a sure source of income to said widow, she, by letter dated February 24th, 1858, directed John C. Green, administrator, to proceed to collect the whole Shackleford debt, principal and interest, but did not so direct as to the Field and Newby debts, as the interest on them was not only paid, but was paid semi-annually, and continued to be so paid until the commencement of the war. And, in addition to the interest so collected by said administrator on the Field and Newby debts prior to the war, he collected $1,000 on each of them on account of principal—that is, $1,000 on the former on the 4th of April, 1860, and a like sum on the latter on the 17th of September, 1857.

John C. Green, administrator, did not collect the Shackleford debt, as required by Mrs. Shackleford, in 1858. But during 1858 and 1859 he paid to the distributees large amounts upon their earnest and oft-repeated importunities; and, looking to all the facts and circumstances disclosed by the record,

the fair inference is, that the money thus received by the distributees was really advanced by John C. Green out of his own funds, and not out of money collected and in his hands belonging to the estate; and that, having been directed to collect the Shackleford debt, he intended to collect it and thus reimburse himself. He, however, died in 1860 without having effected this purpose, and hence, upon the settlement of his administration accounts, after his death, there appeared due his estate from the estate of his intestate this sum of $4,571 72, the validity and justness of which has been so pertinaciously, but groundlessly, assailed in the bill of the complainant, the appellee here.

The Shackleford, Field, and Newby debts were investments made by the intestate, F. J. Thompson, many years prior to his death. The debtors, especially the two first named, Henry Shackleford, afterwards Judge Shackleford, and Judge R. H. Field, appear to have been the intimate personal friends of the intestate. He took from them such security as to him seemed best. For the Field debt he only took the bond of Judge Field, the debtor, who appears to have owned a large fortune in land and slaves, which at his death was unincumbered by a single judgment or trust deed. His large slave property was lost by the war, but he died seized and possessed of 1,800 acres of valuable real estate. The Shackleford debt was secured by a deed of trust on the farm " Cleveland." After the death of Judge Shackleford this property was sold under the deed of trust, and M. G. Shackleford, now the wife of Col. J. C. Gibson, one of the defendants to the complainant's bill in this suit, and Lucy B. Shackleford (now Legrand), daughters of said Henry Shackleford, became the purchasers. Other debts were secured by subsequent trust deeds on Cleveland. The purchasers, M. G. and L. B. Shackleford, arranged about these, executed their bond as aforesaid for $4,002 62, that being the amount of the original Shackleford debt, and interest thereon to the date of their purchase, received a conveyance, and

secured said $4,002 62 by a trust deed on said farm, Cleveland. And afterwards, by an arrangement between said purchasers, the said M. G. Shackleford, now Gibson, became the sole owner of "Cleveland," and she and her husband, Col. J. C. Gibson, have held possession thereof ever since.

John C. Green having died in 1860, James W. Green, his brother, succeeded him as administrator of F. J. Thompson, deceased; and the said James W. Green being also one of the executors of John C. Green, deceased, and the estate of said Thompson being indebted to the estate of John C. Green in said sum of $4,571 72, as of the 4th of April, 1860, as shown by the settled, approved, and recorded accounts of said Green as administrator of said Thompson, he, said James W. Green, the representative of both the debtor and creditor estate, transferred from the former to the latter the said Shackelford debt of $4,002 62, which, together with the sum previously paid by him in his said double representative capacity, was equal to and discharged the said debt due from said Thompson's estate to said John C. Green's estate.

But it is insisted that this transfer was illegal, null, and void. It is a familiar doctrine that when the same person is the representative of both the debtor and the creditor estate, he may, out of funds in his hands belonging to the debtor estate, pay a debt due to him as representative of the creditor estate. This doctrine is founded in justice, and grows out of the very necessities of the situation. One who is the personal representive of only one estate, and, at the same time, the creditor thereof, or one who is the representative of two estates, one of which is indebted to the other, cannot sue himself, for the simple reason that he cannot be both plaintiff and defendant in the same suit. Hence, in 2d Williams on Executors, p. 902, it is said: "If the same person be the personal representative both of the creditor and of the debtor, he may retain out of the effects of which he is possessed as the representative of the debtor, to satisfy the debts due to him as the representative of the

creditor." The same doctrine has been recognized and acted upon time and time again by this court. See *Morrow* v. *Peyton* 8 Leigh 54; *Harvey's ex'ors* v. *Steptoe*, 17 Gratt., 289; *Caskie's ex'ors* v. *Harrison's ex'ors*, 76 Va., 85.

If the doctrine thus sanctioned be true, if a person who is the personal representative of both debtor and creditor may, out of the money or other effects in his hands pay the debts due from the debtor estate to the creditor estate, how, and upon what conceivable principle, can it be said that he may not assign and transfer a *chose in action* for the same purpose? Common sense teaches us that there is and can be no good reason why he may not.

John Cook Green died in 1860, and his brother, James W. Green, succeeded him as administrator of F. J. Thompson. The bill arraigns James W. Green as administrator, upon the same charges made against his predecessor, John Cook Green: 1st. That he failed to sell the slaves, and allowed them to be lost by the results of the war. 2d. That he, like his predecessor, John Cook Green, failed to collect the Field and Newby debts. 3d. That "other valuable assets and choses in action" belonging to the estate of F. J. Thompson, his intestate, went into the hands of James W. Green, administrator, for which he has not accounted. And to these is added, as the burden of complaint, the assignment and transfer by James W. Green of the Shackleford bond aforesaid from the debtor estate of F. J. Thompson to the creditor estate of John Cook Green, deceased. All of these charges, urged in the bill, have been already sufficiently noticed, and have been shown to be utterly groundless.

Such is the case made by the bill, and so much of the evidence as is necessary to determine the question under consideration, and that question is, did the circuit court err in refusing to dissolve the injunction?

If we look alone to the vague, indefinite, and groundless charges which constitute the case as made by the bill, it is

clear that no proper case is made for overcharging and falsifying the settled accounts, and that the injunction should never have been granted; and when we look at the case made in the light of the evidence contained in the record, and in the light of the well-settled principles which control in such cases, it is clear beyond all question that the circuit court committed gross error in refusing at the hearing to dissolve the injunction.

The law in its wisdom, and for the protection and repose of society, provides the tribunal—the court under whose supervision the *ex parte* settlements of the accounts of executors and administrators must be made; and the tribunal constituted for the purpose, appoints its commissioners to make such settlements and report them, and when made as required by law, the court receives, examines, and confirms them, if properly made, and by its order causes them to be recorded.

In the eye of the law, such settlements, when duly and regularly made, approved, and recorded, are invested with a degree of sanctity which forbids that they should be disturbed for slight or trivial causes. Such settlements have, too, a certain degree of efficacy as evidence of the correctness of the accounts thus settled, and this because of the integrity accredited to the tribunal appointed by law for the adjustment of such matters. It is true that an *ex parte* settlement is only *prima facie* evidence of a due administration of assets, so far as the settlement goes, and it may be surcharged and falsified; but this must be done, if at all, in strict accordance with long and well-settled legal principles and rules of practice, and in due time.

When, as in this case, an administrator has regularly settled his accounts before a commissioner, and an attempt is made to have the accounts overhauled and resettled, the complainant in his bill must specifically point out the items charged to be erroneous, assign a sufficient reason as to each item sought to be surcharged or falsified, and must sustain his allegations; else, to the extent that he fails to sustain them, the settled

accounts must remain undisturbed.   On this principle it was said in *Corbin* v. *Mill's ex'ors*, 19 Gratt., 438, "the court will not, however, decree an account upon a general allegation that accounts so settled are erroneous; the accounts should be impeached on specific grounds of surcharge and falsification." And in *Newton* v. *Pool*, 12 Leigh, 112, it was said that "such audited accounts are only to be corrected in the particulars in which they are proved to be erroneous, unless corruption in the tribunal itself be established; and though great and numerous errors appear, or even though the executor or administrator appear to have taken an unfair advantage, does not return to the court, or exhibit to the auditors an inventory or appraisement of the estate, yet the audited accounts are to be taken as *prima facie* evidence, to be corrected so far as surcharged and falsified by proof."

In the light of these principles, and in view of the conclusions already announced as to the rambling, incoherent, and groundless charges which constitute the case as made by the bill, it is clear beyond dispute that the appellee, Samuel W. Thompson, entirely failed to present or even suggest anything in his bill entitling him to be entertained for a moment in a court of equity—certainly nothing commending him to the favorable consideration of such a tribunal.   It, therefore, necessarily follows that the circuit court of Culpeper, instead of refusing to dissolve the injunction, should have rebuked the complainant's false clamor by promptly dissolving the injunction and dismissing his bill.   But not only did that court refuse to dissolve the injunction, but went on, and in the total absence of anything to justify or even excuse its action, directed a re-settlement of these administration accounts, the result of which has been to tie up the estates of John Cook Green and James W. Green, successive administrators of F. J. Thompson, deceased, and to prevent for years the proper use and enjoyment thereof by their respective heirs and distributees.

2d.  The second and last assignment to be considered is, that the circuit court erred in decreeing the re-opening and re-settlement of the administration accounts respectively of John Cook Green and James W. Green as administrators of F. J. Thompson.

From what has been said in the discussion of the questions involved in the first assignment of error, and in view of the conclusions arrived at, and in view of the authorities cited to sustain them, it follows that this assignment of error is also well taken.   Indeed, the question here presented is dependent upon and is necessarily inseparable from the question raised by the first assignment of error; for if, upon the case made by the bill, answers and proofs, the injunction prohibiting the sale of the farm " Cleveland," should have been dissolved, it goes without saying that a re-settlement of the accounts should not have been ordered.

It is, then, only necessary to refer briefly to the evidence not yet referred to, and to deduce therefrom the proper conclusions, in order to demonstrate the true inwardness that prompted this suit, the fallacious character of the claims asserted in the bill, and the falsity of the charges resorted to to sustain them.

The circuit court in its decree says, substantially, that the accounts are ordered to be re-settled " mainly" because, in its opinion, these administration accounts had never been properly settled.   From what source the judge of the circuit court obtained the information that induced this conclusion, it is impossible to determine; but certain it is, there is nothing in the record to warrant it.   It is, however, insisted in argument that in the settlements made, there are no separate distributee accounts stated, and that the items paid or advanced to the respective distributees are mixed up with the general administration accounts, and that this irregularity constitutes a fatal defect for which the accounts should be re-settled.

It is not pretended that the accounts as stated, so far as they go, show that any one of the distributees got either more or

less than he or she was entitled to, or that any one of them is charged with what was not received, or that the items were so arranged as not to be readily understood by any one interested, or that by the mode of statement adopted, the items are so arranged as to produce results injurious to any one of them. See *Garrett, ex'or,* v. *Carr,* 3 Leigh, 407.

It is true, generally speaking, that the separate distributee accounts should be stated, so as to enable all persons interested to readily understand the state of accounts, and to enable the court to clearly apprehend and pass upon and reject or confirm them, it being the duty of the court to see that estates are properly administered. But in answer to this objection, which is merely to the form of stating the accounts, and not to their substance, it is sufficient to say that there is no absolutely inflexible rule on the subject; and that the accounts in question show what was received by the administrator, and what was disbursed by him, and to whom; so that no one interested could fail at a glance to see and understand the true state of things; and it is obvious that no injury could reasonably result to any one by reason of the alleged defect in the form of stating the accounts merely.

Moreover, it appears that Mrs. M. H. Thompson had many outstanding accounts against her; and that the other distributees directed these be paid by the administrator and charged to the estate in the general administration account, and it was, as to her, accordingly so done. This of itself sufficiently explains and even justifies the mode of statement objected to.

In his bill the complainant, Samuel W. Thompson, speaks with glib assurance of the large fortune left by the intestate, his grandfather, F. J. Thompson, when, in fact, it was a small estate and made but a modest competency for the three distributees, requiring industry and frugality on their part to preserve it. But they seem to have craved higher, or, at least, different modes of life than obtained in Culpeper, and one of them, F. J. Thompson, Jr., seemed ambitious of the show-

man's life, and he attached himself to the circus, became, it seems, a rambling showman, and thus gratified his youthful ambition. In his deposition in this cause, however, he deposes in a straight-forward manly way; he testifies to the high character borne by John Cook Green, and says he never heard that said Green owed the intestate's estate a large sum of money, or anything, until after the institution of this suit.

The other two, Mrs. M. H. Thompson and George C. Thompson, removed to the city of Baltimore, where the latter went into business, and where, in the blaze of city life and city ways, their small fortune very soon melted away as the dew before the morning sun; and they found themselves in a distressing state of impecuniosity. Neither of these distributees, however, so far as shown by the record, ever even intimated a suspicion against the fidelity of John Cook Green or James W. Green, either in their representative capacity or as men and citizens of unblemished character. But, twenty-five years and over after the death of John Cook Green, and seventeen years after the completion of the transactions mainly complained of, the appellee, Samuel W. Thompson, a son, and the administrator of George C. Thompson, one of said distributees, assumes the role of injured innocence, presents his bill made up of a tissue of false charges—not one of which is founded in reason or has the slightest justification or excuse in any fact or circumstance disclosed by the record; and when these charges, so wantonly made, if true and supported by proof, would consign to merited obliquy and disgrace the memory of men who lived and died without reproach.

It has been shown that there is absolutely nothing in the record tending in the remotest degree to bring in question the assignment and transfer of the Shackleford bond in payment of the debt due from the estate of F. J. Thompson to the estate of John Cook Green; nor is there anything upon which to found even a suspicion that the debt in satisfaction of which the transfer was made, was not strictly just and honestly due.

On the other hand, the validity of the debt and of the transfer by which it was paid, is powerfully sustained by evidence in the record independent of and aside from the settled and recorded accounts.

Why, then, when the Shackleford debt had become honestly the property of the administrator of John Cook Green, should the injunction have been granted prohibiting the sale by the trustee of the farm Cleveland, as required of the trustee by said administrator? It is, in fact, inconceivable why the injunction was ever granted, when it was manifest that a proper case was not made by the bill, and when, if the claim had even been plausible, it was, in equity and conscience, repulsively stale. Why, too, did the circuit court at the hearing go on and refuse to dissolve the injunction and order a resettlement of the accounts, when the evidence, then in, so far from sustaining the bill, practically disproved its every charge, and when the voice of every one assailed by these unsupported charges was hushed in death? Aside from every other consideration, taking the bill on its face, and the great lapse of time, the very staleness of the claims asserted ought to have been a sufficient guarantee that a court of equity and conscience would reject it. On this subject it has been laid down clearly and forcefully by an eminent English judge, that "nothing can call this court" (a court of equity) "into activity, but conscience, good faith, and reasonable diligence—when these are wanting the court is passive, and does nothing." This language has been often quoted with approval, and the rule thus clearly stated followed by this court. See *Hays* v. *Goode*, 7 Leigh, 487; *Caruthers* v. *Lexington*, 12 Leigh, 619; *Atkinson* v. *Robinson*, 9 Leigh, 393; *Carr's adm'rs* v. *Chapman*, 5 Leigh, 176; *Stamper's adm'r* v. *Garnett*, 31 Gratt., 564; *Hatcher* v. *Hall*, 77 Va., 576; *Harrison* v. *Gibson*, 23 Gratt., 212; *Hill* v. *Umbarger*, 77 Va., 653.

But the parties assailed in this suit need not, either in respect to their character and standing as men, or as to their

fidelity as administrators, the protection of the mere technical advantages given them by the law; for the record itself is replete with evidence, independent of the settled accounts, which amply vindicates their transactions as correct, and their memory against the assaults made upon them.

There are a large number of letters copied into the record, which were written by these distributees, respectively to John Cook Green and James W. Green. These letters show to what straitened circumstances they were reduced, their great need of money, and how they, especially Mrs. M. H. Thompson and George C. Thompson, repeatedly urged and even begged for money—not money of theirs in the hands of these administrators belonging to the distributees, but for money to be advanced, to be loaned to them, and for which they offered to pay very high rates of interest. There is, however, not an intimation that either of these administrators ever took advantage of their necessities in this respect, though there is abundant evidence that they made large advances to the distributees out of their own funds. These letters, moreover, make the inference irresistible that the distributees knew of the transaction in respect of the Shackelford debt and fully acquiesced in the same from the date of its occurrence.

In a letter from George C. Thompson, one of the distributees, and the father of the appellee, Samuel W. Thompson, the author of this suit, dated May 12th, 1866, he says : "Please let me know what is the prospect of my mother getting any funds from the Shackelford sale, also please send me a statement." This letter obviously refers to the sale under the original trust deed at which M. G. and Lucy B. Shackelford became the purchasers of the farm, Cleveland, executed the bond for $4,002 62, afterwards transferred to the estate of John Cook Green as aforesaid, and secured that bond by a trust deed to James G. Field, trustee, the enforcement of which trust by the rightful owner of the debt thus secured, has been made the pretext for this litigation so burdensome to

the estates respectively of John Cook Green and James W. Green. It was not very long after this letter of May 12th, 1866, that the Shackelford debt was transferred to the estate of John Cook Green.

Subsequent to said transfer, a number of letters were written by each of the distributees to James W. Green, in not one of which is any allusion made to the Shackelford debt; and thus additional evidence is afforded that the distributees not only knew of and acquiesced in the transfer of said bond, but approved of it as a just and proper transaction by which the estate of John Cook Green was re-imbursed for advances generously made to them in the hour of their distress. Nor is there in either of the numerous letters referred to, which were written subsequent to the transfer of the Shackelford debt, and cover a long period of years, any intimation whatever that John Cook Green had, as attorney for the distributees, received $4,000 in 1859, on account of the sale of the house and lot in Culpeper. This charge in the bill is the boldest and baldest of all the subterfuges resorted to to set off the just debt of $4,571 72, due from the estate of F. J. Thompson to the estate of John Cook Green. The letters referred to also disclose the further fact that George C. Thompson, in Baltimore, had advanced small sums to Mrs. Thompson, for in one or more of her letters to James W. Green, urging and imploring him to advance her some money, she says: "I have borrowed from George until I am ashamed to ask him any more." Such is substantially her language. Again she represents herself as unable to buy her spring clothing, and therefore importunes James W. Green to make a small advance to her; and she repeatedly assures him that she knows he has done the best he could, and expresses her gratitude for his kindness. In one letter George C. Thompson seeks the loan of a small amount from James W. Green, and asks to borrow on the faith of his mother's note, or to sell her note to James W. Green at a ruinous discount. These things show what was the

object of George C. Thompson, in his letter of May 12th, 1866, asking "what is the prospect of my mother getting any funds from the Shackelford sale?" He was after getting back the money he had loaned his mother from time to time. In one of her letters to James W. Green, Mrs. Thompson, speaking of John Cook Green, says "he is an honest man (there are not many.)"

Is it not absolutely incredible, in the light of the facts disclosed by these letters, that John Cook Green, as attorney or otherwise, ever had any connection with the sale of the house and lot in Culpeper, or that he collected $4,000, the purchase price thereof, and has not accounted therefor? This suit, in the light of the facts disclosed by the record, was born of a reckless disregard of the rights and characters of trusted and trustworthy fiduciaries, or was the product of an idle dream; and whether the one or the other, nothing has been developed in the progress of the suit in the least tending to justify or excuse it. Much stress is put upon the fact that neither John Cook Green nor James W. Green returned an inventory of the effects of their intestate that came to their hands; and this seems to be relied upon as in some measure justifying the assumption that the decedent left a very large fortune, and the charge that many thousands went into the hands of these administrators respectively, which have not been accounted for. In this argument two important facts are overlooked. 1st, That it is not usual for a succeeding administrator to cause an appraisement and to return an inventory, that being usually the work of the first administrator. 2d, That George C. Thompson, one of the distributees, and the father of the complainant and appellee here, Samuel W. Thompson, was the first administrator, and had, of course, full access to all the effects; that he caused no appraisement to be made, and failed to return an inventory. So that if many thousands, or any thing went into the hands of either of the administrators and was not accounted for, the charge could with much greater plausi-

bility be laid at the door of George C. Thompson than at the door of either of the other two administrators. But whilst there were doubtless some immaterial irregularities—immaterial under the circumstances of the particular case, there is no just ground for imputing improper motives to either of the three administrators; nor is there any ground for charging a *devastavit* upon either of them.

The first administrator, George C. Thompson, gave bond in the penalty of $52,000, thus indicating that the assets that went into his hands did not exceed in value $26,000. John Cook Green, the second administrator, gave bond in the penalty of $32,000, showing that not exceeding $16,000 went into his hands. James W. Green, the third administrator, gave bond in the penalty of $20,000, showing that about $10,000 of assets went into his hands.

The record shows that the aggregate amount paid out by the three administrators to the creditors and distributees was $23,800, of which $18,000 was paid out by the two first administrators in less than five years after the death of the intestate, and this out of an estate of the estimated value, in 1855, of $21,000, exclusive of the slaves. James W. Green, the third administrator, and, as such, successor of John Cook Green, received, or had subject to his control, very little, if anything, other than the Shackleford, Field, and Newby debts. The first-named debt, he administered by paying with it the debt or the balance of the debt, due from F. J. Thompson's estate to the estate of John Cook Green. This, with other sums disbursed, made paid out by James W. Green the sum of $5,500, which, added to the amount disbursed by his predecessors, makes disbursed by all of them the sum of $27,800. These results speak volumes in behalf of the promptness and fidelity of these administrators, and amply vindicate their transactions as such, and their memories against the charges so unjustly brought against them. The decree appealed from is, in every respect, palpably erroneous, and must be reversed and annulled

with costs to the appellants, and a decree entered here dissolving said injunction and dismissing the complainant's bill.

FAUNTLEROY, J., dissenting said:

I dissent, wholly, from the opinion of the majority of the court in this case.

A statement of the facts, as they are disclosed by the record, will fully illustrate the justice and the reasons why I do not concur.

In the year 1855, Francis J. Thompson died intestate, in the county of Culpeper, leaving his widow, Martha H. Thompson, and two sons, George C. Thompson, who resided in the city of Baltimore, and Francis J. Thompson, Jr., who was also a non-resident of Virginia, as distributees of his personal estate and heirs-at-law of his realty.

He had been a retired merchant, living on the interest of his money, invested chiefly in the bonds and notes of his friends and neighbors in the county of Culpeper, aggregating about $21,000 of solvent interest-bearing principal, which, with a house and lot in the town of Culpeper, and household and kitchen furniture, together with seven slaves, valued at about $5,000, constituted his estate, worth, at the least, $30,000.

Soon after his death, his son, George C. Thompson, living in Baltimore, qualified in the county court of Culpeper county, as administrator of the estate, and held the trust for about a year, when he resigned it. In 1856, John Cook Green, an attorney-at-law, qualified as administrator, *d. b. n.*, upon the estate, and continued such until his death, which occurred in July, 1860.

In July, 1860, James W. Green, also an attorney-at-law, and brother and partner of John Cook Green, then qualified as administrator *d. b. n.*, of said Francis J. Thompson, deceased, and held the trust till his death, which occurred in April, 1884.

Neither John Cook Green, nor James W. Green, adminis-

trators *de bonis non* as aforesaid, made or returned any appraisement or inventory of the estate; but among the assets which came successively into their hands as such administrators, were three large debts due to their intestate, the said Francis J. Thompson, in his lifetime, viz: one from R. H. Field for $4,000, principal; one from Robert Ward of $2,831, principal; and one from Henry Shackelford for $2,609.    The field debt was unsecured; though, in 1856, when John Cook Green qualified as administrator *d. b. n.* of the estate, R. H. Field, the debtor, was the owner of 60 or 75 slaves, much stock, and other personal property, and remained so possessed up to the beginning of the war in 1861, and died seized and possessed in 1864 or 1865, of 1,800 acres of land without judgment or incumbrance upon it.

The Ward or Newby debt, and the Shackelford debt, were amply secured by deeds of trust upon land.   In 1867, the deed of trust on the tract of land called "Cleveland," which secured the Shackelford debt, was foreclosed by James W. Green, the administrator *d. b. n.* of Francis J. Thompson, and M. G. Shackelford, (now Gibson, wife of J. C. Gibson,) and her sister, Lucy Sinclair, became the purchasers at the sale, and executed their bond for $4,402, which bond was at once transferred or assigned by James W. Green, administrator *d. b. n.* of said Francis J. Thompson, *to himself* as executor of John C. Green, in payment of a debt alleged to be due from F. J. Thompson's estate to John C. Green, a former administrator *d. b. n.* of the said Thompson's estate, as of April 4th, 1860; as was made to appear by the *ex parte* settled account of the said John C. Green, administrator *d. b. n.*, made by the said James W. Green, administrator *d. b. n.* of the said Thompson's estate.

This said purchase money bond, so assigned, was secured by a deed of trust on the "Cleveland" tract of land, dated November 21st, 1867.   In September, 1884, (James W. Green having died in April, 1884,) at the request of J. Ambler

Brooke, (who, after the death of James W. Green, executor, had qualified as administrator *d. b. n.* of John Cook Green,) James G. Field, the trustee in the deed of trust of November 21st, 1867, from M. G. and L. B. Shackelford, before recited, advertised the "Cleveland" land in said deed of trust conveyed, for sale at public auction, to pay the aforesaid purchase money bond of the said M. G. and L. B. Shackelford for $4,402, which, as beforesaid, had been assigned and transferred by James W. Green, administrator *d. b. n.* of F. J. Thompson's estate, to himself as executor of John Cook Green, deceased.

Samuel W. Thompson, the appellee, upon seeing or learning of the said advertisement, and thereby, for the first time, being informed of the existence of the Shackelford debt, filed the bill in this suit in his own right as distributee of the estate of his father, George C. Thompson, deceased, and as the sole owner of the estate of F. J. Thompson, deceased; and by assignments from his grandmother, M. H. Thompson, and his uncle, F. J. Thompson, Jr., and his mother, S. H. Thompson, who had been all the while ignorant of the Shackelford debt, against James G. Field, trustee; and the appellants, J. Ambler Brooke, administrator *d. b. n.* of John Cook Green, deceased, Ann° S. Green, widow and executrix of James W. Green, deceased; and A. McD. Green, Francis J. Thompson, Jr., and others, defendants, praying for an injunction to restrain the advertised sale of the "Cleveland" land, and that the assignment of the Shackelford bond of $4,402 from said James W. Green, administrator *d. b. n.* of F. J. Thompson, to himself as executor of John C. Green, might be set aside and cancelled; and that the sale of complainant's interest in the estate of F. J. Thompson, deceased, to said A. McD. Green, be also set aside; and that John C. Green's estate and James W. Green's estate be required to account for the many thousands of dollars of personal property of the estate of F. J. Thompson, deceased, which came into their hands, either as administrators, attorneys, or assignees; that the said Ann S. Green, executrix

of James W. Green, be required to render an account of the administration of James W. Green upon the estate of F. J. Thompson, deceased; and that the estate of the said Green be subjected to the payment of the Field and Newby debts, and the value of the slaves and other assets of the estate of F. J. Thompson which went into the hands of the said administrator, and were lost, wholly or in part, by the laches and negligence of the said administrator; and praying for general relief. Upon this bill, an injunction was awarded restraining the sale of the "Cleveland" land as advertised, until the further order of the court.

At the November term, 1884, of the said circuit court the defendants, Ann S. Green, executrix of James W. Green, deceased, and J. Ambler Brooke, administrator *d. b. n.* of John C. Green, deceased, and A. McDonald Green, filed their general demurrers and answers to the bill. After the taking of a number of depositions as to the validity of the sale and assignment by S. W. Thompson of all his interest in the estate of his grandfather, S. J. Thompson, deceased, to A. McD. Green, that question was settled and eliminated from the case by the entry of an order of voluntary surrender and reassignment by the said A. McD. Green to the said S. W. Thompson at the March term, 1885. On the 8th day of June, 1885, the court entered the decree complained of—" On consideration whereof the court, declining at this time to dissolve said injunction, and being of the opinion that, under the circumstances of this case, lapse of time and death of parties do not bar the complainant from having ordered a settlement of the fiduciary accounts, mainly because the court does not consider that such an account has ever been properly settled, doth adjudge, order, and decree that it be referred to one of the master commissioners of this court to take, state and report an account of F. J. Thompson's several administration accounts by his several administrators, and also a distributee account of said F. J. Thompson's estate, showing what sums are properly chargeable

to each; in stating which accounts said master commissioner is instructed to accept as true the items of payments to the widow and distributees, and to all the other items of the *ex parte* accounts settled by said several administrators, except James W. Green, and except such as appear on their face to be erroneous; the court being of opinion that, after the lapse of time, it would be improper to permit the distributees of Francis J. Thompson, deceased, to question the items of payments to them," &c.

From this decree the defendants, J. Ambler Brooke, administrator *d. b. n.* of John C. Green, and Ann S. Green, executrix of James W. Green, deceased, appeal.

The decree complained of is not a final decree, and it decides no principle or question of fact controverted in the cause, or. put at issue by the pleadings, except to say, guardedly, in favor of the appellants, that the master commissioner is instructed to accept as true the items of payments to the widow and distributees, and all the other items in the *ex parte* accounts of the administrators; "that, after the lapse of time, it would be improper to permit the distributees of F. J. Thompson, deceased, to question the items of payment to them." The decree does not perpetuate the injunction; it only declines, for the time being, to dissolve it, and to dismiss the bill out and out for all its scope and purposes.

The bill called upon J. Ambler Brooke, administrator *d. b. n.* of John C. Green, to show his title to the Shackelford bond, which was an asset belonging to the estate of F. J. Thompson, deceased, and to do this in his answer, he preferred the *ex parte* settled accounts of J. C. Green, administrator *d. b. n.* of F. J. Thompson, deceased, (made by himself in his lifetime, and by James W. Green, his executor, many years after his death) by which it is made to appear that the estate of F. J. Thompson was indebted to the estate of J. C. Green; and then, to meet this indebtedness, he also preferred the assignment of the said bond

by James W. Green, administrator *d. b. n.* of F. J. Thompson, deceased, to himself as executor of J. C. Green.

The bill alleged that this assignment was invalid, not only because of the incompetency of J. W. Green, administrator *d. b. n.* of F. J. Thompson, deceased, to make the assignment to himself as executor of J. C. Green, deceased, but also, because in fact, no debt existed as due from the estate of F. J. Thompson, decased, to the estate of J. C. Green, deceased. Upon the face of the accounts relied on by the appellants to maintain the existence of the debt, it is manifest that they are erroneous, and not what they purport on their face to be. All through the account, there is an improper and unlawful intermingling of the executorial and distributee accounts.

The settled accounts of J. C. Green, administrator *d. b. n.* of F. J. Thompson, deceased, extending from 1855 to 1860, while they show the administration of assets to the amount of $10,000 or $11,000, embraced items amounting to less than $2,000, which are properly chargeable in an executorial account, and all the residue is on account of payments or advancements made to the respective distributees. An examination of the I settlement of J. C. Green, administrator *d. b. n.* of F. J. Thompson, shows on its face that during the year ending June 16th, 1856, he received in cash assets of the estate, $2,922 93, and paid out for the estate a few small bills, aggregating $243 44, leaving a balance due the estate, by him as administrator, of $2,679 49. All the other items of charges consist of advancements to the widow, or for her use and benefit, and to G. C. Thompson, a son and distributee of the decedent; and there is a mistake in adding the charges of a $1,000 against the estate, and in favor of the administrator *d. b. n.* The account settled for the year ending June 16th, 1857, shows receipts in cash by the administrator, assets of the estate amounting to $4,623 33, and paid during the time debts of the estate aggregating $322 40, (all the other payments were ad-

vancements to distributees) leaving a balance due the estate by the administrator, *d. b. n.*, J. C. Green of $4,300 93.

The third settlement as administrator *d. b. n.* for the year ending June, 16th, 1859, shows that during that year he received in cash as assets of his decedent's estate, $1,216 93, and paid out debts due by the estate aggregating $115 14, leaving a balance due the estate by the administrator of $1,201 79 for that year.

These are all the accounts which J. C. Green, as administrator *d. b. n.* of F. J. Thompson, laid before the fiduciary commissioner of Culpeper county.   He died in 1859, and these accounts, *ex parte*, show that he was at his death, largely indebted as administrator to the estate of his intestate.   It is admitted that F. J. Thompson, deceased, was not indebted at the time of his death, to J. C. Green; and the debt claimed against his estate is not by reason of any obligation incurred in his lifetime, but it is made to appear by an *ex parte* settlement of J. C. Green's administration accounts, made by James W. Green, for the year ending June 16th, 1860, as executor of J. C. Green.   It is alleged in the bill, that if this debt did exist at all, it was due from the distributees of the estate of F. J. Thompson for advancements made to them by J. C. Green, administrator *d. b. n.*, and was not a debt due by the estate; and this is manifest from the face of the *ex parte* accounts upon which appellants rely.   And it is further insisted in the bill that whatever debt did exist was paid off in full by the said distributees by the proceeds of the sale of the house and lot in the town of Culpeper, $4,000, received by J. C. Green, and no where accounted for by him or charged to him by James W. Green, executor, in the account settled for him as aforesaid.

The accounts, *ex parte*, brought forward by the appellants in their answer to show their title to the Shackelford debt, are plainly and undeniably erroneous on their face; showing that whatever indebtedness, if any existed, to the estate of J. C.

Green, administrator *d. b. n.* of F. J. Thompson's estate, arose not from payments or advancements made by him for or on account of the estate which he represented, but on account of advancements made to one or more of the distributees; and the court properly directs, in its decree, a restatement of the administration accounts in the mode required by law, keeping the execatorial and distributee accounts separate, showing what fund was in hand for distribution, and how the same had been distributed; and merely re-arranging the items and charges in the account, (without falsifying or rejecting one of them) in their proper order, so as to enable the court to ascertain whether or not, in point of fact, the estate of F. J. Thompson, deceased, did owe anything to the estate of J. C. Green, at the time of the assignment of the Shackelford bond, by James W. Green, administrator *d. b. n.* of Thompson's estate, to himself as executor of John C. Green, deceased.

The court below declared, what is palpable from the record, that no proper account of the administration of J. C. Green, administrator *d. b. n.* of F. J. Thompson's estate, had ever been settled; and the order of reference was absolutely necessary in the interest of truth and justice.

No harm or prejudice can be done to the estate of John C. Green, either by his death or by lapse of time, by this decree. Not a single item is to be stricken from, or added to, the account; and by the terms of the decree itself, the distributees are forbidden to gainsay a single item of payments made to them, and the estate of J. C. Green cannot be deprived of a single item of credit which appears in the account.

It may be that J. C. Green, the administrator *d. b. n.* of F. J. Thompson's estate had overpaid or improvidently made advancements to the distributees; and it may be, as charged in the bill, that J. C. Green had fully reimbursed himself for these advancements by the retention of the proceeds of sale of the town house and lot in Culpeper, for which it is alleged he has no where accounted; but whatever the fact as to this may

be, these overpayments or advancements to the distributees could not be properly charged to, or paid out of the general assets of the estate in the hands of the administrator.

In such case the debt is one against the distributees, personally, for which the administrator may retain the distributive ascertained share of the distributee so overpaid; but the executorial account and the distributee account, must by law and by necessity be kept, and stated, separate and distinct; and it was manifestly improper to apply the general assets of the estate in recoupment of a debt created by advancements to the distributees. And this is especially true, if as contended by the appellant, in his petition, that this Shackelford debt, an asset belonging to the estate of F. J. Thompson, deceased, had been set apart for the widow and distributee of the decedent.

If this Shackelford debt had been set apart for, and belonged to Mrs. M. H. Thompson, (as the appellants state and strenuously insist in their answer,) then by what authority did the administrator *d. b. n.* of F. J. Thompson's estate, who held it in his representative character in trust for her, assign it in 1867 to himself as executor of J. C. Green, to pay a debt due (even if such were the admitted fact,) by Thompson's estate to J. C. Green's estate? Appellee is the assignee of this debt, and he is entitled to have the estate of F. J. Thompson, deceased, properly settled, to ascertain whether his assignor, Mrs. M. H. Thompson, had received her proper distributive share of the estate of her husband, more or less. And the same may be said of the appellee, as assignee of F. H. Thompson, and distributee of his father, G. C. Thompson, deceased. And, if by the settlement of a separate and proper distributee account, it should appear that one of the distributees had been overpaid, then the appellee, as assignee of such a one, cannot be called on to refund such overpayment out of the funds which may be due him as assignee of another distributee. He could only be called on to refund as distributee of his father,

G. C. Thompson, deceased, and then only to the extent of assets descended.

The appellee, though sole owner of the estate of F. J. Thompson, deceased, yet holds the estate in different rights; and it is as much to his interest and his right, to have these administration accounts restated and reformed, by proper classification of separate executorial and distributee accounts, as if the several distributees were suing in their own right.

The appellants concede that the assets which went into the hands of the several administrators of the estate of F. J. Thompson, deceased, were at least $21,000, independent of the slaves. Mrs. M. H. Thompson, the assignor of appellee, was entitled to one-third of this $7,000, as of 1856; yet the accounts show that, during a period of nearly thirty years, she has received from her husband's estate a sum less than $5,000. But it is strenuously urged by the appellants that the right of appellee to call in question the assignment of the Shackelford bond, as before said, or to reopen the settled accounts of J. C. Green and James W. Green, as representatives of the estate of F. J. Thompson, is now barred by statute of limitation, or lost by appellee's laches or neglect.

We know of no statute of limitation that applies, in terms, to the circumstances of this case; and the equitable doctrine of *laches* is not an inexorable rule of law, but is governed by the special circumstances of each case. (*Lamar* v. *Hale*, 79 Va. (4 Hansbrough, pp. 148 and 164.)

In the case of *Morrison's executor* v. *Householder's adm'r*, 79 Va., (4 Hans.) p. 631, the defence was founded upon lapse of time and alleged laches of the appellees, and in that case the court said: "It is true that equity will not lend its aid to enforce stale demands when, by reason of the death of parties, or loss of papers, or from other circumstances, there can no longer be a safe determination of the controversy; but such circumstances do not exist in the present case. The transactions in question have not become obscured by lapse of

time; * * * the evidence to enable the court to do justice between the parties has not been lost."

Estoppel from acquiescence must rest upon actual knowledge of the wrongful act; its injurious effects, and unreasonable delay. (2 Pomeroy's Equity, p. 817; 2 Perry on Trusts, § 849; *Rowe* v. *Bentley*, 29 Gratt., 763; *Nelson* v. *Carrington*, 4 Mun., 332–343.

Now, what are the facts of this case, as disclosed by the record, and what the direction and effect of the decree complained of? From 1855 down to 1883, all the parties interested in the estate were non-residents of the State of Virginia, and had not knowledge of what was going on in the administration of the estate, one of them, F. J. Thompson, residing in Africa; another, George C. Thompson, father of the appellee, residing in Maryland; and F. H. Thompson had not been in Virginia for twenty-seven years. George C. Thompson died in 1874, and Mrs. M. H. Thompson became *non compos mentis* from age. As soon as S. W. Thompson, the child and heir of George C. Thompson became of age, and became cognizant of his rights, he brought this suit. He is before the court not only as distributee of George C. Thompson, but as assignee of F. J. Thompson and M. H. Thompson; and the evidence shows that none of the Thompsons knew of or suspected the assignment of the Shackelford debt by J. W. Green, administrator *d. b. n.* of F. J. Thompson's estate, to himself, as executor of J. Cook Green, until the "Cleveland" farm was advertised for sale to pay a debt alleged to be due to the estate of J. C. Green, deceased, by the estate of his intestate, F. J. Thompson, deceased, by J. Ambler Brooke, administrator *d. b. n.* of said J. C. Green, deceased. Neither George C. Thompson, administrator, nor J. C. Green, administrator *d. b. n.*, nor J. W. Green, administrator *d. b. n.* of the estate of F. J. Thompson, ever made or returned any inventory of the said estate by which the parties interested could know or find out what assets, choses in action, or other property have come into their hands

respectively; and when the appellee, S. W. Thompson, upon attaining to his majority came to Virginia and sought information from J. W. Green, administrator *d. b. n.* of F. J. Thompson's estate, he was informed by the said J. W. Green, that all the estate of F. J. Thompson, deceased, consisted of two debts— the Field and the Newby debts—(and these subject to the debts due by the estate), while he was never informed, or in anyway advised of even the existence of the Shackelford debt as an asset of the said estate. John C. Green, an attorney-at-law at Culpeper, was the counsel of F. J. Thompson in his lifetime, and counsel for his estate and his personal representative, after the administrator, George C. Thompson resigned, and he had charge of the real estate and paid taxes and insurance thereon. When he died in 1860, James W. Green, his brother and partner, qualified as his executor, and as administrator *d. b. n.* (in the third degree) of the estate of F. J. Thompson, deceased. He, in 1860, settles an *ex parte* account, not of his own administration, but of the administration of J. C. Green, the former administrator *d. b. n.* of F. J. Thompson's estate; and then, in 1867, as administrator *d. b. n.* of F. J. Thompson's estate, assigns to himself, as executor of J. C. Green, deceased, the Shackelford bond, an asset in his hands belonging to F. J. Thompson's estate, to pay an alleged indebtedness from the estate of F. J. Thompson to the estate of J. C. Green, made, if made, by heavy over-payments advanced to the distributees of F. J. Thompson's estate, after the death of the said F. J. Thompson, by the said J. C. Green, former administrator *d. b. n.* of the estate of the said decedent.

An administrator *d. b. n.* is not responsible for the administration of a former administrator, nor of a former administrator *d. b. n.;* nor can he call him to account, or sue for a *devastavit*—there is no privity between them. (*Rives* v. *Patty*, 43 Miss., 388; *Beall* v. *New Mexico*, 16 Wall., 535; *Carrick* v. *Carrick*, 23 N. J. Equity R., 364.) And the reason and principle of this established rule of law would forbid James W. Green, as

executor of John C. Green, to settle the administration accounts of John C. Green, a former administrator *d. b. n.* of F. J. Thompson's estate, establish by this *ex parte* settlement an apparent indebtedness against Thompson's estate in favor of J. C. Green's estate, arising out of alleged overpayments by said J. C. Green, administrator *d. b. n.* of the estate, to the distributees of the estate; and then by his own assignment, as administrator *d. b. n.* of Thompson's estate, to himself as executor of J. C. Green, former administrator *d. b. n.* of Thompson's estate, undertake to recoup these asserted apparent overpayments to one or more of the distributees of the estate.

If an administrator make advances to the distributees of his decedent's estate, he does so at his own risk; and if he have not taken refunding bonds, no subsequent administrator can recoup for him out of the decedent's estate. The only remedy in such case, would be a chancery suit against the heirs and distributees so overpaid.

The authorities relied on by counsel for appellants, (1 Lomax on Executors, p. 414; *Morrow* v. *Peyton*, 8 Leigh, 54; *Harvey's ex'or* v. *Steptoe*, 17 Gratt., —; *Caskie's ex'or* v. *Harrison*, 76 Va., 85;) sustain the proposition, that when the same person is representative of two persons, one of whom has died indebted to the other, he may retain out of the assets in his hands as representative of the estate of his debtor, to pay the debt due to the creditor estate; which debt was created, recognized, or established before the two estates came into the hands of the common administrator.

But this is not that case; and it would be carrying the doctrine of *retainer* very dangerously far to permit an administrator *d. b. n.* (in the third degree), as executor of an administrator *d. b. n.* in the second degree, to settle an *ex parte* account of the former administrator *d. b. n.* (in the second degree) and establish an indebtedness from the estate in the first degree to the estate of the former administrator *d. b. n.* in the second

degree by settlements which show on their face that the apparent indebtedness was not chargeable to the administration or executorial account, but to the distributee account, if at all; and then, as administrator *d. b. n.* of the estate in the first degree, to assign to himself the general assets of his estate in the first degree, to pay the estate of the administrator *d. b. n.* in the second degree. But be this as it may, the decree appealed from does not decide the question of the validity of the challenged assignment; the bill denies the existence of the alleged indebtedness of F. J. Thompson's estate to the estate of J. C. Green, and alleges that, if such debt exist at all, it was due from the distributees of the estate of F. J. Thompson for advancements made to them by J. C. Green, the administrator *d. b. n.*, and to enable the court to decide this important issue of fact, the master commissioner is directed to reform the accounts, and, without altering or rejecting a single item of credit to the estate of J. C. Green, to separate and properly classify the administration and the distributee accounts improperly intermingled and merged upon the face of the accounts preferred.

It is true that J. C. Green and J. W. Green have both departed this life, but there is no suggestion of any loss of papers or other evidence; on the contrary, the record discloses the fact that they have been preserved and are filed as exhibits with the answers. Appellee accounts for the delay in bringing his suit by infancy, non-residence, and want of notice and knowledge; and the appellants have possession of all the papers throwing any light upon the subject of investigation. For the foregoing reasons, I think that the decree appealed from is right, and I am constrained to dissent from the opinion of the majority of the court.

DECREE REVERSED.