# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## Moorman v. Arthur.

## Same v. Town of Danville.

### January 25th, 1894.

1. EQUITABLE RELIEF—*Resulting trust.*—Equity hath exclusive jurisdiction where plaintiffs claim that land was bought with funds of their ancestors' estate by his administrator, who took the title in his own name, and afterwards listed it in his schedules in bankruptcy, but with a declaration of the said trust written therein, which affected with notice the purchasers of the land under the bankrupt proceedings.

2. IDEM—*Evidence—Case at bar.*—In the case here, *held,* that though parol testimony is admissible to establish a resulting trust against the letter of a deed, yet the trust must be proved, as alleged, by clear, cogent, and explicit evidence; and that the evidence adduced to establish the trust claimed by the plaintiffs, is not such, but on the contrary, is conflicting, improbable, and insufficient.

3. RESULTING TRUST—*Distributees—Creditors.*—Where administrator converts his intestate's personalty into real estate, a trust will result therein for the benefit of his widow as to one-third, and his children as to the residue; but his creditors may, through a court of equity, subject the real estate to the payment of their debts, if the personalty was liable therefor.

4. BANKRUPTCY—*Sale—Validity.*—Where land is sold under proceedings in bankruptcy, persons interested in the land, but not parties, are not bound by the sale, though the bankrupt was the administrator of the estate through which they claim.

5. IDEM—*Limitation of action—Laches.*—The federal statute limiting actions by or against assignees in bankruptcy as to property vested in them to two years, applies not to suits against purchasers from such assignees. Nor can the claims of persons to said property be barred by *laches* so long as they are ignorant of their rights. *Lamar* v. *Hall,* 79 Va., 164.

6. Witnesses—*Competency.*—Two defendants, against whom no relief was prayed for, and who had been discharged in bankruptcy, *held*, not incompetent to testify, though parties to the suit and to the transactions under review therein.
7. Declarations of Trust—*Notice to purchasers.*—Where petitioner in bankruptcy appends to inventory of his property a declaration that one parcel had been bought with trust money, though it stood in his name, such declaration is unauthorized by the federal statute, and constitutes no notice of such trust to purchasers at the sale under the bankrupt proceedings.
8. Idem—*When admissible.*—Such declarations to be admissible must have been made when declarant had no interest to make them, and not when made in favor of his own family against his creditors, by one who is not only insolvent, but in bankruptcy. *Phelps* v. *Seely*, 22 Gratt., 573.

Appeal from decree of circuit court of city of Danville, rendered May 26, 1891, in two chancery causes heard together; in the first Wm. A. Moorman and others being complainants and T. J. Arthur and others being defendants, and in the second Wm. A. Moorman and others being complainants and the town of Danville and others being defendants. The circuit court dismissed the bills and the complainants appealed. Opinion states the case.

*John W. Riely, Berkeley & Harrison,* and *Christian & Christian,* for appellants.

*Green & Miller, Peatross & Harris,* and *George C. Cabell,* for appellees.

FAUNTLEROY, J., delivered the opinion of the court.

In an elaborate and exhaustive opinion in writing, filed in the cause and made part of the decree appealed from, the judge of the said court reviews all the law and the evidence in the records so fully, so ably, and conclusively, upon every point of law and fact involved in the causes at issue, that it is the judgment of this court, after mature consideration of the whole

of the records brought under review by this appeal, to adopt the said opinion of the said judge of the circuit court of the city of Danville as the opinion of this court, and to affirm the decree appealed from, for the reasons therein set forth.

Opinion of Judge Whittle:

These causes are of more than ordinary importance, both on account of the value of the property in controvery, and of the legal questions involved; and they have been argued elaborately and with very great ability.

The first-named cause was instituted November 11, 1886; the second, April 25, 1887.

By a decree of the —— term, 18—, they were ordered to be heard together; they were so argued, and will be so considered. The complainants are William A. Moorman, Samuel J. Moorman, and James C. Moorman, sons and heirs-at-law of James C. Moorman, deceased. The substantial defendants are purchasers, immediate and mediate, of the real estate sold under orders of the district court of the United States for the then district of Virginia, *in re*, W. W. Keen, bankrupt.

There is a discrepancy in the allegations of the bills in the two causes as to the property claimed, or rather as to the origin of the claim, the pleader in the second-named cause, it would seem, endeavoring to meet or conform to the facts developed by the evidence in cause No. 1. With this exception, which will be noticed later on, the allegations of the bills are substantially the same. They are, that James C. Moorman departed this life in Pittsylvania county, October 13, 1863, seized of valuable real estate and with large personal property, leaving him surviving a widow, Nannie C. Moorman, and complainants (who at the death of their father were all infants), William A. Moorman having been born October 15, 1856; Samuel J. Moorman, June 20, 1858, and James C. Moorman, May 31, 1863; that the widow intermarried with

one Charles Dougherty, October 29, 1867, and departed this life September 7, 1872, after the birth of a child, which died early in infancy, and that her husband, Charles Dougherty, is still living; that at the November term, 1863, of the county court of Pittsylvania county, W. W. Keen, the father of Nannie C. Moorman and the grandfather of complainants, qualified as the administrator of the estate of James C. Moorman, deceased, executing bond as such with security in the penalty of $300,000; that said administrator promptly began to collect the assets of the estate, and within twelve months from his qualification made sales of tobacco amounting to $30,000, and by February 1, 1865, made other sales of tobacco to the amount of $53,433 71, and, in addition, realized large amounts of cash from other assets of the estate; that, being unable to find satisfactory investment for these funds (they say, in cause No. 2, he consulted and advised with his partner, James M. Walker, as to a proper investment), in the fall of 1863 or during the year 1864, he purchased 262½ acres of land from Decatur Jones, as an investment of said funds, paying $30,000 in cash of the moneys of said estate therefor, but took no conveyance of title; that, in 1863, he sold Dr. T. D. F. Guerrant about 92½ acres of land, lying almost wholly in the town of Danville, in the extreme western part thereof, on Dan river; that Guerrant paid the purchase price in full, and took immediate possession of the property, renting a portion of it in 1864 to J. J. Hankins, but neglected to take a conveyance; that during the year 1864, W. W. Keen concluded to repurchase said 92½ acres of Guerrant for the benefit of complainants and their mother, Nannie C. Moorman, and during that year exchanged with Guerrant the 262½ acres, theretofore purchased of Decatur Jones therefor, said Guerrant taking possession of the latter, and said Keen, as administrator, occupying and cultivating the farm for the benefit of complainants and their mother; that W. W. Keen had purchased the 92½-acre tract from James M. Walker, who, along with said Keen as W. W.

Keen & Co., had purchased it from E. F. Keen; that W. W. Keen did not convey the property to Guerrant, and when the exchange was made did not change the title on the deed-books, because he did not know how he could convey real property to himself as administrator. He therefore held the 92½ acres of land in his own name, but for the benefit and as the property of the estate of James C. Moorman, deceased. On February 6, 1867, Decatur Jones conveyed the 262½-acre tract to Guerrant; that on October 15, 1867, W. W. Keen went into bankruptcy, his petition bearing date October 5th of that year. Said petition was duly sworn to, and accompanying it were schedules "A" and "B," showing respectively his liabilities and assets. As the 92½-acre tract stood in his name, he was compelled to return the same in his schedule "B 1," and did so, but set forth in said schedule that "in the year 1863 or 1864, petitioner being the administrator of James Moorman, deceased, the general manager of his estate, and the father of his widow, and having in his hands large sums of Confederate money arising from sales of tobacco belonging to said estate, and becoming aware of the rapid depreciation of said money, and knowing of no investment which he could safely make in stocks or other securities, determined to invest a portion of the same in real estate for the benefit of said estate. Shortly after he purchased of Decatur Jones a tract of land lying in Pittsylvania county, Va., containing about 262½ acres, for the sum of $30,000 in Confederate currency, which he paid in cash, which tract of land I had intended to cultivate, with the slaves belonging to said estate. Finding, however, that the interest of the estate would not be promoted by such a course, I exchanged the said tract of land with a certain T. D. F. Guerrant for a tract of land mostly within the corporate limits of the town of Danville, with good improvements, and to which there is attached a public ferry across Dan river. The said exchange was an even one. No title having been made to petitioner by Decatur Jones for the tract of land purchased of him at the

time of said exchange, he, by direction of petitioner, conveyed
the same to the said Guerrant. The 92-acre tract referred to
had been sold to said Guerrant by the petitioner, but not con-
veyed before said exchange was made. After said exchange
the petitioner still held title to said land in his own name.
His only reason for so doing was that he did not consider it
competent for him to hold this land by deed as administrator
(as has been stated). The tract of land was obtained in
exchange for a tract which had been purchased with
money belonging to said Moorman's estate, and has since
been held as the property of said estate." (The bills give
extracts from the statement in "B 1." The foregoing
is the statement in full.) That, thus, W. W. Keen did not
surrender said property in bankruptcy, having no beneficial
interest in it, and none that, under the laws of the United
States, could or did pass to his assignees or trustees in bank-
ruptcy. In the bill in cause No. 2 the allegation in relation to
the real estate in question are that some time prior to the fall
of 1863 E. F. Keen sold to W. W. Keen and James M. Wal-
ker, as W. W. Keen & Co., a tract or several tracts of land
situated now in the corporate limits of Danville, and which
embraces the land in controversy, put them into the immedi-
ate possession, but did not make them a deed thereto until
January 22, 1864, which was recorded December 11, 1865 ;
that in the fall of 1863, W. W. Keen, by and with the consent
of James M. Walker, sold a part of said property to Dr. T. D.
F. Guerrant, to wit: that part lying between what was known
as the Lower Ferry road, the Upper road, James Thomas' line,
and Branch street, of the town of Danville, and so enclosed
there, situate in the northwest corner of said town, as shown
in the plat exhibited—and put him in the possession and occu-
pancy thereof, receiving in payment therefor the full payment
in tobacco and slaves, but made said Guerrant no deed of con-
veyance. They there set out an exchange of the 262½ acres
purchased by W. W. Keen of Decatur Jones with Guerrant

for the lot above described, and say that all of said several transfers were known to and acquiesced in by James M. Walker; that said Decatur Jones had not made W. W. Keen a deed, nor was there any deed made to Keen by Walker at that time, nor by W. W. Keen & Co. to Guerrant, nor by Guerrant to Keen, it being in time of war when men could not transact business with customary regard to the requirements of law. But the payment of the purchase money was complete, and possession was delivered; that Keen directed Jones to convey title to the 262½-acre tract to Guerrant, which, as stated, was done by deed bearing date February 6, 1867, and recorded June 21, 1867, but that Guerrant had had possession since 1864; that on November 15, 1865, after Keen had taken possession of the land sold to Guerrant, and exchanged by him to Keen as administrator of James C. Moorman, deceased, and which possession was for the benefit of said estate, Walker conveyed to Keen his interest therein, and also his interest in several adjacent tracts, being all the property conveyed to W. W. Keen & Co. by E. F. Keen; that Keen took title in his own name for the reason given in the bill in cause No. 1, but contemporaneously advised his daughter, Nannie C. Moorman, and his family, and Decatur Jones and his wife, Harriet Jones, a sister of W. W. Keen, and Guerrant, and Walker, that at the time Walker conveyed said entire tract to W. W. Keen he had received largely over the $30,000 he had paid Jones for the 262½-acre tract—indeed, he had received from the sales of manufactured tobacco belonging to the estate of his decedent alone net cash to the amount of $83,921 88, and he therefore increased the amount of land he got of said Guerrant, and held for said estate all the balance of that so conveyed to him by Walker, and thus, from November 15, 1865, said W. W. Keen occupied and held, for the benefit of said estate of James C. Moorman, deceased, having exchanged for a part thereof the said Jones farm and received payment for the balance out of the said funds in his hands as administrator, the entire pro-

perty so conveyed to W. W. Keen & Co., and this he did openly and notoriously; that neither complainants nor their mother, nor her husband were made parties to the proceedings in bankruptcy, and that the record therein does not show any title to the property in controversy other or different from what is set forth in the statement in schedule "B 1"; that on January 15, 1868, the creditors of W. W. Keen, bankrupt, selected W. G. Banks and Charles L. Powell as trustees of the estate, which selection having been approved by the court, said W. W. Keen, by deed dated March 13, 1868, conveyed to said trustees "all his estate and effects absolutely, to have and to hold in the same manner and with the same rights in all respects as the said Keen would have had or held the same if no proceedings in bankruptcy had been taken against him"; that on June 1, 1869, said bankrupt conveyed to said trustees "each and all of the various lots, tracts and parcels of land, whether lying in the town of Danville, county of Pittsylvania, or State of Georgia, which were listed or surrendered by the said Keen in said schedule in bankruptcy, wherein a more particular description thereof will be found"; which deed was duly recorded in the clerk's office of the hustings court of Danville; that on December 4, 1869, W. G. Banks and J. D. Coles, as special commissioners, were ordered to sell the said real estate of said bankrupt, including "house and a tract of land of about ninety acres, to which it attached a ferry over Dan river, in Pittsylvania county, Virginia"; that January 14, 1870, an order was made to the same effect, and February 25, 1870, John A. Herndon divided said tract of land into eighteen lots, aggregating 91 acres and 56 poles, and returned a plat to said commissioners. On March 1, 1870, the sales were made, after due advertisement, were reported to court November 15, 1870, and December 3, 1870, duly confirmed; that the purchase money has all been paid, and title conveyed, and that the original purchasers have sold and resold and subdivided the land until the names of the present owners are numberless, and

many of them cannot be discovered; that some time in 1884 complainants brought suit to recover a lot of land, of which their father died seized, and advised their counsel that they had heard vague rumors that they were entitled to other lands somewhere in Danville, and employed said attorneys to represent them in all matters concerning their father's estate; that in 1886 said attorneys were examining a title to a lot within the boundary of said property, and were employed to look though said W. W. Keen's bankrupt papers. They discovered the statement on schedule "B 1," and refused to pass the title. They then advised complainants of their discovery, who were thus for the first time informed of their rights in 1886; that the purchase of Decatur Jones and the exchange with Guerrant were made when there were only two judgments docketed against W. W. Keene, aggregating, principal and interest, $2,000, and that these were liens upon other lands of Keen, and did not bind either the 262½ or the 92½-acre tracts, and were satisfied and paid out of other lands of said Keen; that the facts detailed constituted W. W. Keen a trustee for complainants and their mother, and they set forth what they conceive to be the respective interests of themselves and Dougherty, the husband of their mother, in the land; that by the bankrupt act the 92½ acres did not pass, and could not have passed under the control and jurisdiction of the district court, and that neither of the deeds referred to carried said property to the trustees of W. W. Keen, bankrupt; that said district court had no jurisdiction to order the sale of said land, or any part of it, and that the sales and conveyances made under its orders were void; that the purchasers were advised of complainants' title fully and absolutely by said proceedings and records; that complainants were infants at the date of the sales, and while they had heard hints from members of W. W. Keen's family that the said 92½ acres of land belonged to, and should have been conveyed to them, they never knew that they had any chance to recover the same until within a few months past;

that W. W. Keen is dead, and the legal title to said land is outstanding in his heirs. In cause No. 2 the bill undertakes to meet the matters of defence relied on by the defendants in cause No. 1. And they say that the defendants who are named, and those made defendants as unknown parties, are in possession of parts of the said land which was sold by W. W. Keen & Co. to Guerrant, and by him exchanged to W. W. Keen for the estate of Moorman, lying between the lower Ferry road, the upper Ferry road, James Thomas' line, and Branch street, and derived title under direct or *mesne* conveyance from Banks and Coles, commissioners as aforesaid, thus confining their claim to that portion of the $92\frac{1}{2}$ acres embraced within the boundaries aforesaid; that at the time of the investment of the personalty into land Nannie C. Moorman was discovert, and knew thereof and assented thereto; that when she intermarried with Dougherty her interest was an equitable estate of one-third in the realty; that upon the birth of a child Dougherty became tenant by the curtesy initiate in said one-third, which, upon the death of his wife, became an estate by the curtesy consummate. They conclude by making all who are known to be interested parties defendant, but waive answers under oath; ask that an inquiry be had as to the unknown claimants, and pray that all deeds and conveyances be set aside; that a deed be made to them to said property; that they be paid and reimbursed for the rents and profits, and for general relief. The infant defendants answer by guardian *ad litem*. The administrator *de bonis non* of W. W. Keen, deceased, files a formal answer, and his heirs-at-law disclaim all interest in the subject matter of litigation. James M. Walker and T. D. F. Guerrant, who were not originally made defendants, but were brought in subsequently without formal amendment, plead their discharge in bankruptcy in bar to any liability that may be sought to be fixed on them, and pray to be dismissed. Many of the defendants do not answer, but quite a number demur and answer. Some deny that the lots owned by them

are within the boundary of the land sought to be recovered in cause No. 2. Some content themselves with a denial of complainants' claim, and insist that they are *bona fide* purchasers for value and without notice, while others make full and specific answer to the various allegations of the bills, and set out fully their several grounds of defence. They admit the death of James C. Moorman; that his heirs and next of kin are correctly named; the intermarriage of his widow with Dougherty; the birth of a child by that marriage; its death in infancy, and the subsequent death of the mother; that W. W. Keen qualified as the administrator of the estate of James C. Moorman, deceased, and gave bond as alleged, but they deny assets to the amounts claimed; and, from information, say that the assets of the estate which came to the hands of the administrator were converted into Confederate money, and perished with the downfall of that Government. They deny all knowledge of conversations between Keen and his partner, James M. Walker, or that the former ever contemplated investing the money of the estate in real estate. They deny that at the date of the alleged purchase by Keen of the 262½ acres of land from Decatur Jones that he had in his hands $30,000, or any amount, belonging to his intestate's estate. They admit that E. F. Keen sold to W. W. Keen and James M. Walker, partners as W. W. Keen & Co., the property embraced in the deed from the former to the latter, dated January 22, 1864, (Exhibit "E. F. K."), but their knowledge is derived solely from the recordation of that deed. They deny all knowledge of the alleged sale to T. D. F. Guerrant, or of the alleged exchange, and deny that any of said transactions were had with W. W. Keen as administrator of Moorman. They insist that the "Jones" tract (so far as any money is proved to have been paid) was paid for with the funds of W. W. Keen & Co.; that the property now sought to be recovered was bought and paid for by W. W. Keen & Co.; that title was taken by them, and the property was so held until the disso-

lution of the firm and a division of its property; that the firm existed from 1861 till late in 1865, and during its existence became possessed of several parcels of land in Danville and Pittsylvania county; that in the fall of 1865 the real estate was divided between the partners, two parcels were released in severalty to Walker by Keen and wife, and about the same time Walker and wife released to Keen their interest in the remaining two parcels of land owned by the firm, and Keen and wife also released to Walker and W. W. Clarkson their interest in a parcel of land owned by the firm composed of Keen, Walker & Clarkson, and they insist that the land so set apart and conveyed to W. W. Keen, was as his individual property, and was so held, used, and occupied by him until he surrendered it in bankruptcy. They deny that Keen paid for either the "Jones" tract or the "Tunstall" tract with the money of Moorman's estate, and insist that if he ever had intention of conveying or holding it for the benefit of that estate, he neglected it until the rights of others had attached, and he had no power to do so. They admit the bankruptcy of Keen; that he listed the property in controversy, and that he made the declaration in regard to it on schedule "B 1" given above, but they deny the truth of the facts stated therein. They admit the execution of the deed by Keen to Banks and Powell, his trustees in bankruptcy, but deny that they refer to the schedules in bankruptcy for a description of the property, or that it was necessary for them so to do. The bankrupt's property devolved upon his trustees by operation of law, and the deed did not confer upon them any other or greater rights, but merely designated the persons to carry into effect the purposes of the bankrupt act. They admit that neither complainants nor Mrs. Dougherty were technically made parties to the bankruptcy proceedings, otherwise than by the aforesaid declaration of the bankrupt, and say they know of no other way in which they could have been made parties, unless some one had filed a petition for them; that all necessary steps were

taken in said matter to ascertain the rights of all lienors and other parties, and to secure a free and unincumbered sale of the lands of the bankrupt. But that neither in said proceeding or elsewhere were any steps taken to establish the pretended claim of complainants, or to maintain as true the *ex parte* declaration of their grandfather and trustee, W. W. Keen, on schedule "B 1," until these suits were instituted, long after his death. Later on, when it became necessary to estimate the contingent right of dower of the bankrupt's wife, he treated said land as his own, and included it in the deed in which his wife relinquished her right of dower in the lands. The claim for commutation was brought about by Keen, and the land in question formed the chief portion of the estate taken into said estimate, and he succeeded in having settled upon his wife one of the most valuable houses and lots in Danville, and he knew that if his declaration in schedule "B 1" was true his wife had no color of claim to dower in said land. The declaration was made when it seemed probable that it might have the effect of securing to his grandchildren a part of the property which would otherwise go to his creditors. But when the truth of the statement would have deprived his wife of property which was settled to her use, and afterwards jointly enjoyed by her and her husband, it was not brought in any manner to the attention of the court or of any of the parties to the proceedings; that Keen was present at the sale of the property, but did not then, or at any other time, intimate that complainants of any one else had any claim to the property whatever; that there were judgments against E. F. Keen, which attached to said property while owned by him, and passed to W. W. Keen & Co., who had notice, with said liens upon it, and that the judgments against W. W. Keen also attached, and were liens thereon; that subsequently to the conveyance of said land in severalty to Keen by Walker, Keen became a bankrupt, and the lands, subject to the liens aforesaid, passed, by operation of law, to his assignees or trustees; that the judgments against

him were more than sufficient to consume all the lands surrendered by him in bankruptcy; that the lien creditors instituted a suit in the circuit court of Pittsylvania county to subject said land to the payment of their debts; but upon the application of the trustees in bankruptcy, and some of the creditors proceeding in said suit were stopped, and the district court assumed jurisdiction, and convened said creditors before it. Afterwards an account of liens on the real estate of said bankrupt was duly taken, and said lands regularly and duly decreed to be sold for the satisfaction of the liens upon the same; that W. G. Banks and J. D. Coles were duly and regularly appointed by a decree of said court to make sale of said lands, and in pursuance of said decree, did advertise and sell the same; that the creditors of E. F. Keen, as well as W. W. Keen, were duly convened before said court, and made parties, and said sales were duly reported and confirmed, and deeds directed to be made to the purchasers on the payment of the purchase money; that the purchase money was afterwards fully paid and conveyances made to the respective purchasers; that there was no other property from which the liens, to satisfy which the land was sold, against which said judgments could have been enforced, and said judgments were the first liens on said lands; that they had no notice or knowledge, in any manner whatsoever, of any claim of complainants, or of Mrs. Dougherty, or of the estate of James C. Moorman, deceased, to said land, or any part thereof, or of the declaration made by the bankrupt on schedule "B 1"; that they are *bona fide* purchasers claiming under a decree of a court of competent jurisdiction of the subject-matter of the suit, and that their title is free and clear of the alleged secret trust asserted by complainants; that the purchasers at the bankrupt sale acquired not only the title of the bankrupt, but also the title of E. F. Keen, and that they, and those claiming under them, are entitled to hold said lands by the same right that the judgment creditors, who were parties

to said matter in bankruptcy, or convened before the court, might have asserted against the said lands, and received the title which might, in any event, have been lawfully subjected to said judgments, and are not responsible for the application of the purchase-money by the court; that the declaration of the bankrupt on schedule "B 1" was merely an *ex parte* statement, not regularly or formally a part thereof, and not such an assertion of the claim of complainants as would bind purchasers of the land without actual notice of the same; that the declaration does not contain such a description of the lands claimed to have been purchased on behalf of complainants as is sufficient to have warned purchasers, who had no notice of the occupancy of the land by Guerrant, that it was the same land derived by W. W. Keen from E. F. Keen, or to have put them on inquiry as to the truth of the facts therein stated, unless said purchasers had had notice that said land had been occupied or owned by Guerrant; that the interest of complainants, if any they had, were represented by W. W. Keen, their trustee, and he being a party to the bankrupt proceedings, they are barred thereby, although not technically parties themselves; that the matter is *res adjudicata,* and the action of the bankrupt court cannot be collaterally attacked; that complainants' claim, if any they had, is adverse to the trustees in bankruptcy, and, not having been prosecuted within two years, is barred by the limitation prescribed by the bankrupt act; that said claim is barred by the fifteen years' limitation; that the alleged claim of complainants, if any they have, is not a claim to the land, but to the funds which they allege were invested in land, and that the claim accrued to Moorman's administrator, and not to complainants; that the estate was insolvent, and complainants at the time had no real interest in the land; that the funds of the estate belonged to the administrator for the benefit of the creditors, as well as the heirs and next of kin; and, though it may not have been known at the time, it has been subsequently shown that the estate was wholly

insolvent, and the claim is barred by the statute of limitations, because the administrator failed to institute suit for the recovery of the same within five years; that the lapse of time and *laches* of complainants, if not barred otherwise, should preclude them from setting up the claim they now make. To sustain their contention that there were no assets of the estate of Moorman to invest in land, to show that the estate was insolvent, and the declaration of Keen, in schedule "B 1," was untrue, they refer to the record in the creditors' suit of *Soyars and others* v. *Moorman's Administrator and others*, brought in Pittsylvania circuit court in 1872, in which the administrator, Keen, was examined as to what became of the property of his intestate, and stated that it was lost by the results of the war; that the real estate of Moorman was sold, and the proceeds applied to the payment of his debts, leaving large amounts still due and unpaid. They also refer to the suit of complainants against R. W. Lawson to show that the contention of complainants there is inconsistent with the claim asserted by them here.

The last-named case is reported in 85 Virginia, 880, but the admissibility of the record referred to is excepted to by complainants, and, from the view I take of these causes, need not be noticed further.

From the foregoing summary of the contents of complainants' bills it will be observed that their contention is that the 262½ acres of land, known as the "Jones" tract, was purchased by W. W. Keen as administrator of their father's estate, and with its assets, and for its benefit, as an investment; that this tract was afterwards exchanged by said administrator with T. D. F. Guerrant for the "Tunstall Hill" property, also for the benefit of said estate, and that while the legal title to said property was taken in the name of W. W. Keen individually, a resulting trust nevertheless arose for the benefit of the estate; that the property was afterwards listed by Keen in his schedules in bankruptcy, but with the declara-

tion of the trust aforesaid written thereon, which affected the
purchasers of the property under the proceedings in bank-
ruptcy, and all claiming title through or under them with no-
tice.    It will also be observed that the answers deny the exist-
ence of the trust; or, if it existed, that the defendants had
either actual or constructive notice of it.    Before considering
these questions, upon which, in my judgment, the causes hinge,
it will be proper to notice some of the other points which have
been raised and discussed.

It is argued that if the claim of complainants be true—that
the trust existed ; that the bankrupt court never acquired juris-
diction either of the property or parties, and that the sales
under its decrees were nullities—complainants had a full and
complete remedy at law, and should have proceeded by action
of ejectment, and that this court has no jurisdiction of this
controversy, it is sufficient to say that the title of complainants,
if any they have, is equitable, not legal, and that they seek to
set up and enforce a trust of which a court of equity alone has
jurisdiction.

Again, the question, "For whose benefit did the trust re-
sult?" has elicited much discussion, the contention of the
defendants being that it resulted, if at all, to W. W. Keen as
administrator of J. C. Moorman, deceased, or to the creditors
of his estate.    It would seem clear that neither position is ten-
able.    The administrator, by converting the personalty into
real estate, put it beyond his reach, and the creditors can in no
sense be said to have title either to the personal assets or their
product.    Theirs was a mere right to subject it to the payment
of their debts; nothing more. . They might, by proper process,
have reached the personalty in the hands of the administrator
before conversion, and had it applied in discharge of their
debts, or, after conversion, they might have proceeded against
the administrator and his bondsmen, and held him and them
responsible for his *devastavit;* or they might have followed and
subjected the property into which the personalty was converted,

through the medium of a court of equity, to the payment of their debts. But under no conceivable circumstances would the title either to the personalty or realty, by operation of law, devolve upon them. If the personalty had not been converted, subject to liability for payment of debts, it would have passed to the widow and children of the decedent in the proportion of one-third to the former and the residue to the latter. And surely it cannot be maintained that the relations and rights of these parties, *quoad* the property in which the personalty was invested, were changed or altered by the conversion. It is earnestly insisted that the questions upon which this court is asked to pass have been adjudicated by the district court of the United States for the district of Virginia, *in re*, W. W. Keen, bankrupt; that the decrees and orders of that court, whether right or wrong, are final and conclusive, and constitute an absolute bar to the claim which complainants are now prosecuting and seeking to enforce here. Whilst this has been the "bloody ground," as I may say of the case, and counsel have shown much learning and research in its discussion, it seems to me to lie within narrow compass, to depend upon principles, the justness of which must be allowed, and is of easy solution. I take it to be a fundamental principle of law, requiring no citation of authorities to sustain it, that in order for the decrees of a court, of either special or general jurisdiction, to be binding (unless in pure proceedings *in rem*) two things are necessary: It must have jurisdiction of the person and of the subject-matter. The rule is founded upon principles of reason and justice, and the instances in which it has been violated have met with the unqualified disapproval and condemnation of the courts. In *Underwood* v. *McVeigh*, 23 Gratt., 418, Christian, J., in delivering the opinion of the court, said: "The sentence of condemnation and sale was a nullity—void *in toto*. It was rendered absolutely void by the act of the court in refusing to permit McVeigh to appear and be heard. The authorities on this point are overwhelming, and the deci-

sions of all the tribunals of every country where an enlightened jurisprudence prevails are all one way. It lies at the very foundation of justice that every person who is to be affected by an adjudication should have the opportunity of being heard in defence, both in repelling the allegations of fact and upon the matter of law, and no sentence of any court is entitled to the least respect in any other court, or elsewhere, when it has been pronounced *ex parte* and without opportunity of defence, an examination of both sides of the question, and deliberation between the claims and allegations of the contending parties have been deemed essentially necessary to the proper administration of justice by all nations and in every stage of social existence." (See, also, Robinson's Pr., 7th Vol., page 52, and *Ray* v. *Noseworthey*, 23 Wall., 136.) Now, while it may be difficult in every case to answer the query of one of the learned counsel for the defendants, *arguendo*, as to " who are parties to a proceeding in bankruptcy," it is very clear that complainants were not in the matter of W. W. Keen, bankrupt. There is no evidence or even pretence that they ever appeared, either in person or by counsel, or that any process or notice from the bankrupt court ever emanated against them, by publication or otherwise. This is virtually conceded; but the contention is that they were represented by W. W. Keen, either as administrator of their father's estate, or as their trustee. He cannot be said to have been a party in either capacity. He was a party for the purpose of obtaining a discharge from his debts, and for none other, and was discharged June 4th, 1869, as administrator. As has been stated, his power over the subject-matter ceased when he converted the personal assets of his intestate into real estate. Both as administrator and trustee, his interest was adverse to that of complainants. It would have been a case of committing the lamb to the care of the wolf. He would have had to play the double role of plaintiff and defendant at the same time. But I do not understand that the doctrine of representation applies in Virginia between

trustee and *cestui que trust*, so as to hold the latter concluded by decrees in cases in which the trustee is a party, but the *cestui que trust* is not. (Sands' Suit in Eq., page 197; *Richardson* v. *Davis and Wife*, 21 Gratt., 706.)

The extent to which the bankrupt court acquired jurisdiction over the subject matter of this suit, and the effect of its decrees in relation thereto upon complainants, will be considered later on and in a different connection; but the fact that said court had no jurisdiction of complainants, deprives said decrees of the effect claimed for them by the defendants of having adjudicated the rights sought to be litigated here, and of *per se* constituting a bar to complainants' claim. The defendants further claim that complainants' suits are barred by the acts of limitations prescribed by section 5057 of the Revised Statutes of the United States, which declares that "no suit, either at law or in equity, shall be maintainable in any court between an assignee in bankruptcy and a person claiming an adverse interest, touching any property or rights of property transferrable to or vested in such assignee, unless brought within two years from the time when the cause of action accrued for or against such assignee." It will be observed that this section in terms applies only to suits by or against an assignee. The assignee in bankruptcy of W. W. Keen is not a party to these suits (nor am I prepared to say he is a necessary party), and the limitation, therefore, does not apply. Nor does the fifteen years' limitation prescribed by the Virginia statute operate as a bar to the suits. W. A. Moorman, the eldest son of J. C. Moorman, deceased, became of age October 15, 1877, and cause No. 2 was brought April 25, 1887, within less than ten years after he obtained his majority. It is also insisted that complainants have been guilty of such *laches* and delay in asserting their claim as should preclude them from recovery in a court of equity. They were informed of the facts upon which they base their right to recover, by their counsel, in April, 1886, and, as has been seen, the second suit was brought

about one year thereafter, while the first was brought within seven months, and it is not shown that the defendants have been put to any disadvantage by loss of evidence or otherwise in the interval of time that elapsed between the reception of the information and the institution of the suits. "It is well settled that *laches* cannot be predicated of those who are ignorant of their rights. Such a defence is, in equity, only permitted to defeat an acknowledged right on the ground of it affording evidence that the right has been abandoned. Acquiescence cannot be imputed in the absence of all knowledge of the facts of which it is predicated." *Rowe* v. *Bentley*, 29 Gratt., 763 ; *Lamar's Ex'or* v. *Hale*, 79 Va., 164.

"Estoppel from acquiescence," said the Court of Appeals in *Green's Adm'r* v. *Thompson, &c.*, 84 Va., 411, " must rest upon actual knowledge of the wrongful act, its injurious effects, and unreasonable delay." (See, also, *Tunstall's Adm'r* v. *Withers*, 86 Va., 892, and Pomeroy's Eq. J., 2d vol., § 817.) The case affords no ground for the application of the equitable bar arising from *laches*, acquiescence, and lapse of time; but what has been said on this subject applies only to the alleged claim of complainants as heirs and distributees of James C. Moorman, deceased, and not as claimants through their mother. The case stands on a wholly different footing as to Mrs. Moorman's interest. She was fully apprised of all her rights from the first—when she was discovert, in the lifetime and before the bankruptcy of W. W. Keen, and no valid excuse is offered for her failure to prosecute her alleged rights. If the contention of complainants be true, all that was needful was a request that her father and trustee, W. W. Keen, execute the trust in him for the benefit of herself and children, and had he refused she was armed not only with such evidence as has been adduced here, but with her own and her father's, the chief actor in the drama, to sustain her. " She was silent when she ought to have spoken, and she will not be heard to speak when she ought to be silent." The converse of the doctrine laid down

in the cases of *Rowe* v. *Bentley*, 29 Gratt., 763, &c., cited above,. applies with full force to the claimants of the alleged interest of Mrs. Moorman, and if no other defence save that of *laches* was interposed it would defeat a recovery. Having noticed briefly the several special defences relied on by the defendants, we come now to consider the two main questions in the case:

1st. Is the resulting trust, as set forth in the bills, established? and—

2d. Are the defendants *bona fide* purchasers for valuable consideration and without notice?

We will consider these in the order stated. It is contended that W. W. Keen first declared the trust sought to be enforced in 1863, and the evidence chiefly relied on to prove his declarations is that of James M. Walker and T. D. F. Guerrant. As an objection is raised to the competency of these witnesses, that question must first be determined. It is contended that they are parties to this suit; were parties to the original transactions, and participated in, and by their co-operation enabled Keen, the administrator of Moorman, to commit the *devastavit*, and would be liable over to the defendants in the event of a recovery by complainants, and further, that Walker is responsible in his warranty of title in his conveyance to Keen.

It will be remembered that Walker and Guerrant were not originally made parties to these suits; but, upon the filing of the demurrer of Bethell, it was suggested that they were necessary parties, and at the June term, 1889, they were made parties without objection. The court at that time was unacquainted with the record, and, acting upon the statements at bar, admitted them as parties without any consideration as to the necessity for so doing. At the January term, 1891, they filed disclaimers, and set up their discharges in bankruptcy in bar of any liability that might attach to them, and moved that the bills be dismissed as to them. The court, still not having examined the records, and not being sufficiently acquainted with their contents to pass intelligently upon the question, had

the motion noted, but postponed action upon it. No relief is sought in these suits against either of said defendants; but, on the contrary, the complainants are thoroughly committed to the pursuit alone of the property into which they allege the assets of their father's estate were converted. Nor is it clear that the bills could have been so framed as to have attempted the pursuit of the property involved, and of Walker and Guerrant, by reason of their alleged participation in the *devastavit* of Keen, without being open to the objection of multifariousness. I can conceive of no other reason for making them parties, save to exclude their testimony already taken in cause No. 1, and to prevent their examination in cause No. 2. It is by no means plain that their connection with the transaction was of such a character as to render them responsible to complainants originally, or to the defendants by way of subrogation in the event complainants should prevail. But they rely upon their discharges in bankruptcy, as above stated. (See on this subject *Neal* v. *Clark*, 95 U. S. R., 704, and, as to their competency, authorities cited in Mr. Christian's note.) Their liability, if any, is too contingent and remote to render them incompetent as witnesses. The exception to their competency should be overruled, and their motion that both bills be dismissed as to them should be sustained.

It is properly conceded that a resulting trust may be established by parol evidence. The authorities are all to that effect. It is also true that if a trust be impressed upon one piece of property, which is afterwards exchanged for other property, the trust follows, and the latter is affected with the same trust. *Cock* v. *Lullis*, 18 Wall., 342; *Overseers of the Poor* v. *Bank of Va.*, 2 Gratt., 551; *Tabb* v. *Cabell*, 17 Gratt., 160; *Oliver* v. *Piatt*, 3 How. 485; *Cook* v. *Wallace*, 18 Wall., 341. But it is equally as well settled that the evidence to establish the trust must be clear, cogent, and explicit. *Dyer* v. *Dyer*, Leading Cases, 335, 338; *Miller, &c.* v. *Blose's Ex'or*, 30 Gratt., 747; *Jennings* v. *Shackett*, 30 Gratt., 765; 1 Perry on Trusts, sec.

127; Sugden on Vendors, 708: *Phelps* v. *Seeley*, 22 Gratt., 529. And the trust must be proved as alleged. *Dyer* v. *Dyer, supra*, citing *Andrew* v. *Fontaine*, 2 Stockton's Ch'y R., 91. It will be observed that to establish the trust complainants rely wholly upon the declarations of W. W. Keen as made to Mrs. Jones, T. D. F. Guerrant, and James M. Walker, and the circumstances. (I allude now to the declarations alleged to have been made in the fall of 1863, and not to that written on Schedule "B 1," which will be noticed later on.) It will be remembered that the bill in cause No. 1 charges that the "Jones" tract was exchanged by Keen with Guerrant for all the property embraced in the deed of January 22, 1864, from E. F. Keen and wife to W. W. Keen & Co., embracing not only the "Tunstall Hill" property, but also the lower ferry over Dan river, with the land attached, amounting in all to 92½ acres. While all the evidence shows that W. W. Keen & Co. only sold Guerrant a part of this property, witnesses varying in their opinions, as to how much, though the weight of evidence would seem to show sixty-odd acres.

In cause No. 2, in the light of evidence taken in cause No. 1, the charge is that the "Jones" tract was exchanged with Guerrant for the sixty acres, but that W. W. Keen, finding himself largely indebted to the Moorman estate as its administrator, elected to hold the residue of the 92½ acres, having bought out the interest of his partner, Walker, therein in trust for that estate. It may be remarked in passing that there is not a particle of evidence to sustain this allegation, and attempt to reconcile the discrepancy in the bills, and to sustain the declaration of Keen in Schedule "B 1." The witnesses—Mrs. Jones, Guerrant, and Walker—testify as to the declarations alleged to have been made nearly a quarter of a century before, when war was flagrant, and men's minds so disturbed by passing events and the condition of the country that they ceased to apply customary business methods to transactions of vital importance—*e. g.*, Guerrant purchased the "Tunstall Hill"

property, for which he paid ———, investing his all, slaves and tobacco therein, and took no conveyance. He afterwards, in 1864, exchanged this property for the "Jones" tract, and obtained no title until February 6, 1867.

Mrs. Jones was surrounded by a family of eleven helpless children, which absorbed her attention, while Walker, a man of large affairs, was engaged in manufacturing tobacco, banking, farming, trading in lands, negroes, &c., and operating in a territory extending from Virginia to Georgia. It is proper to look to the surroundings of these witnesses with the view of determining the weight to be attached to their recollection of a transaction which did not particularly concern them, and to which they speak twenty-odd years after the fact. It is, therefore, not surprising that we find their statements, as to what Keen's declarations were, variant and irreconcilable. Mrs. Decatur Jones, the sister of Keen and great aunt of complainants, was examined in both cases—the first time, December 21, 1886; the second, September 30, 1887—and yet, upon the second examination, she remembered nothing and would swear to nothing. In her first deposition she proves the sale of the "Jones" tract to Keen, but at what time she cannot say "to save her life." She says the consideration was $25,000 or $30,000 in Confederate money; that she received the last payment, $5,000, herself (the charge is that it was a cash sale); that it was paid to her in bank notes at the residence of Mrs. Holcombe, in Danville, by "Jim Walker." She says her brother, W. W. Keen, afterwards asked why she got after Walker about this money; that it was the last payment and he had intended to make them wait for it. Walker, on the contrary, says: "My recollection is, in the spring of 1864, or early in the year 1864, W. W. Keen requested me to pay Mrs. Decatur Jones $5,000, and I gave her the check of W. W. Keen & Co. for that amount. About the time this check was given W. W. Keen informed me that he owed $5,000, balance on the purchase of the Decatur Jones land, and requested me

to give the check, and I charged it to his individual account on the books of W. W. Keen & Co." In his second deposition he says prior to the payment of the $5,000, W. W. Keen asked him to make it, and that he gave Mrs. Jones the firm-check in the office of their tobacco factory on Bridge street. Now, it will be observed that about this transaction, every whit as likely to have fastened itself upon their memories as the declarations of Keen, these two witnesses contradict each other throughout. Mrs. Jones says the payment was in bank notes at Mrs. Holcombe's, and that Keen chided her for " getting after " Walker about it. Walker says the payment was by the check of W. W. Keen & Co., made in the office of their factory, and at the request of Keen. They not only contradict each other, but both contradict the charges of the bills and the written statement of Keen that he bought the " Jones " tract " for the sum of $30,000 in Confederate money, which he paid in cash and with money arising from the sales of tobacco belonging to said estate." All that Mrs. Jones can be induced to say looking to the establishment of a trust in the " Jones " tract, though hard pressed by counsel, is: " I do not like to say, because I cannot recollect well enough to take an oath. I always understood that he (W. W. Keen) bought it (the " Jones " tract) for Nannie Moorman," and they made the deed to Guerrant, because she understood that Keen had swapped the " Jones " tract to him for the " Tunstall Hill " property, but she was not present.

In answer to the direct and suggestive question: " Did Mr. Keen ever state to you that he bought this property for James C. Moorman's estate?" She answers: " It has been so long I would not like to swear to that effect." She proves no declaration of trust by Keen. Dr. Guerrant is also examined in both cases. He proves his purchase of the " Tunstall Hill " property from Keen & Walker in the fall of 1863, and thinks he held it until the fall of 1864, when he exchanged it with W. W. Keen for the " Jones " tract. Keen gave him as a

reason for the swap that he wanted it for his daughter, Mrs. Moorman; that she was a widow, and he did not want her exposed on that farm in the country so far from him, because it was located and surrounded in a community which was largely negroes, large negro quarters, and, during war times she would have no protection. " That commenced the trade; was the opening, preparing our minds for the trade. * * * And in the same conversation he stated he had purchased the ' Jones ' tract for his daughter, Mrs. Moorman." This conversation was in 1864. He was first examined February 2, 1887, and his second examination September 30 of the same year, is substantially the same. In point of fact, Mrs. Moorman never lived either on the " Jones " tract or the " Tunstall Hill " property, but her husband owned a residence in Danville, which was sold years after the war in the suit of *Soyars, &c.,* v. *Moorman's Heirs, &c.,* on February 24, 1887.

James M. Walker was first examined, and says: " To the best of my recollection, in 1863, W. W. Keen had frequent conversations with me in regard to the investment of some money that he held belonging to the estate of James C. Moorman, deceased, and my recollection is that some time after the frequent conversations he informed me that he had purchased a tract of land from Decatur Jones for the estate of James C. Moorman, deceased. My recollection is that this information was given me in 1863. I can't say what time I advised him, but it was prior to the purchase of the property from Decatur Jones. I don't think he held it (the " Jones" tract) very long. W. W. Keen informed me that he had traded the Decatur Jones property with Dr. T. D. F. Guerrant for the Tunstall property. I think this transaction was in the latter part of 1863. I know the trade was made, and Keen took possession of the Tunstall property after that."

In answer to question 12: " Do you know whether W. W. Keen, prior to the summer of 1864, received any moneys as administrator of James C. Moorman, deceased "? He says:

" My recollection is that I was one of the appraisers of James C. Moorman's estate; that he had considerable quantity of manufactured tobacco, leaf tobacco, and other personal property, and that W. W. Keen realized money for the sale of that tobacco, and I think that this was prior to the summer of 1864." " I think the date of the purchase of the 'Jones' farm was early in the fall of the year 1863."

In answer to the question, if he knew to what end or pur-purpose Keen held the " Tunstall Hall" property, he answers: " I do know, and derived my information from W. W. Keen. My recollection is that in the latter part of the year 1863, or early in the fall of 1863, W. W. Keen informed me that he had exchanged the Decatur Jones tract of land with Dr. T. D. F. Guerrant for the estate of James C. Moorman, deceased."

He was again examined September 30, 1887, and says: "As stated before, W. W. Keen consulted me as to how he should invest this money belonging to the estate of J. C. Moorman, deceased, and did inform me that he had made the purchase of the " Jones" tract of land for the estate of J. C. Moorman, deceased. I don't recollect that he had any special reference to any special money that he purchased it with Moorman's estate, or any other money."

The foregoing are extracts from the depositions bearing directly upon the point under discussion. Can it be fairly predicted of them that they clearly and explicitly establish the charges of either bill? They show that only a part of the 92½-acre tract, claimed to have been exchanged by Dr. Guer-rant with Keen for the " Jones" tract, ever belonged to him. Again, Mrs. Jones "always understood" (from whom it does not appear), that her brother, W. W. Keen, bought the "Jones" tract for his daughter, Mrs. Moorman. And Dr. Guerrant distinctly testifies that Keen told him he purchased it for his daughter, Mrs. Nannie Moorman, not for complainants, not for the Moorman estate, or with its assets, but for his daughter. Walker, with equal pertinacity of statement, says

Keen told him he was going to buy it for the Moorman estate, and afterwards that he had done so. Now, which of these statements is to be adopted? If the former, the trust resulted in favor of Mrs. Moorman, who knew of her rights and failing to assert them until the rights of others intervened, and those claiming under her are estopped from doing so now. It may have been laudable in her to remain silent and permit her father to hold, use and enjoy her property, and finally to surrender it in bankruptcy, rather than to assert her rights and be disowned by him; but she cannot visit the consequences of such a course upon the defendants. But is it incumbent upon a court to undertake to reconcile the serious conflict in the testimony, and to adopt that of Walker rather than of Mrs. Jones and Dr. Guerrant, and, too, against that justly favored class in equity, purchasers for value, and without notice? Or, if it be insisted that Keen made both statements, do his inconsistent statements furnish a safe guide to a mind in search of truth? Aside from these declarations the circumstances would seem to repel the presumption that the assets of the Moormans' estate paid for the "Jones" tract. The witnesses all agree that the purchase was in 1863, and, they claim, for cash. It is undisputed that Moorman died November 8, 1863, and that Keen qualified as administrator at the county court of Pittsylvania following (November 16th). There is no evidence that he left any ready money. To the contrary, Walker, one of the appraisers, testifies as to what the estate consisted of, and no money is mentioned; and, as has been seen, Keen, in his statement in schedule "B 1," says he had in his hands "large sums of Confederate money arising from the sales of tobacco belonging to the estate." The inference is a reasonable one, from the amount of the penalty of the administrator's bond, $300,000, that the personal estate was estimated at half that amount. But it would be unreasonable and against experience that a personal representative, qualifying after the middle of November upon the estate of a decedent who left

no ready money, could have sold property and collected money sufficient to have made a cash purchase of land that year for $25,000 or $30,000 for the estate. The sale of tobacco, too, must have been after the inventory was taken, otherwise the money would have been inventoried in place of the tobacco. And yet we must conclude either that Keen did make sales and collections, as supposed, to sustain the theory that the "Jones" tract was bought and paid for with the money of Moorman's estate, for all the witnesses *una voce* locate the date of sale in the fall of 1863, and Walker early in the fall, which would make it antedate not only Keen's qualification but Moorman's death. The first moneys of the estate traced to Keen's hands were the $12,000 paid him by Harvey, James & Williams, commission merchants, in May, 1864, months after the land was purchased and paid for, if the charge in the bills and the declaration of Keen on his schedules are true. But the last payment, as has been shown, was made by the $5,000 check of W. W. Keen & Co. And, finally, after the close of the war, to wit, on November 15, 1865, W. W. Keen, when the matter was fresher in his mind than when he went into bankruptcy several years later, took a conveyance of the "Tunstall Hill" property to himself individually. Thus it would seem that the circumstances are not only not helpful in reconciling the conflict in the alleged declarations of Keen, but tend strongly to discredit the truth of any and all of them. "A mere parol declaration by one that he is buying land for another is not sufficient to establish a resulting trust, there must be some proof of an actual or constructive payment by the person claiming such trust." 1 Perry on Trusts, § 134. "Proof of mere admissions of one that he purchased for another, without proof of some previous arrangement or advance of money by such other, is insufficient to create a resulting trust." 20, § 138. "A resulting trust may be set up by parol evidence against the letter of a deed, &c., but the testimony to produce this result must in each case be clear and unquestionable. Vague and

indefinite declarations and admissions long after the fact, have always been regarded, with good reason, as unsatisfactory and insufficient." *Phelps* v. *Seeley*, 22 Gratt., 573. " The witness swears to no fact or circumstance capable of being investigated or contradicted, but merely to a naked declaration of the purchaser, admitting that the purchase was made with trust money. That is in all cases most unsatisfactory evidence, on account of the facility with which it may be fabricated, and the impossibility of contradicting it, besides the slightest mistake or failure of recollection may alter the effect of the declaration." Opinion of Sir William Grant in *Lench* v. *Lench*, 10 Ves., 511–518, quoted with approbation by Bouldin, J.; in *Phelps* v. *Seeley*, *supra*, and in *Bostford* v. *Burr*, 2 John Chy. Rep., 405, 11 Chancellor Kent, in commenting on the value of such testimony, says: " This is a remarkable instance of the inaccuracy and fallacy of parol testimony, and shows the great danger there is of giving much latitude to these implied trusts founded on naked declarations in opposition to the solemnity and certainty of written documents." See, also, *McKeenan* v. *McKeenan*, 33 N. J.; Eg. R., 384, and other cases cited by counsel for defendants to the same effect. A resulting trust must arise at the time of the execution of the conveyance. Payment of the purchase money at the time of the purchase is indispensable. A subsequent payment will not by relation attach a trust to the original purchase." *Beecher* v. *Wilson*, *Burns*, &c., 84 Va., 813. Now it can hardly be said that the evidence in these causes measures up to requirement. But suppose it be conceded that the trust is established. It is not pretended that the defendants had notice of it, and to give it efficacy, it must be coupled on to a declaration of which they did have notice. For, says Christian, J., in delivering the opinion of the court in *Carter* v. *Allen:* "It is sufficient to say that it has been the uniform course of decision in this State, as well as the other States of the Union, to hold that the *bona fide* purchaser of a legal title is not affected by any

latent equity founded on a trust, fraud, or incumbrance, or otherwise, of which he had not notice, actual or constructive." 21 Gratt., 249, and cases cited.

The contention, however, is that this link is supplied by what is styled the "declaration of trust" on schedule "B 1" of Keen's bankruptcy. proceedings, which it is claimed confirmed and corroborated the previous declarations, confirmed the purchase of the "Jones" tract for the Moorman estate and the payment of the purchase price with its assets, and confirmed the exchange of it with Guerrant for the "Tunstall Hill" property. I have considered the declarations of Keen alleged to have been made in 1863, without adverting to the objection made to their admissibility. They were made, if at all, while he was in possession of the property; were contemporaneous with the transactions, were made when he was solvent, and were against his interest. Declarations made under such circumstances are clearly admissible. *Dooley* v. *Baynes*, 86 Va., 644.

It is insisted that with the declarations of 1863 eliminated, complainants are still entitled to recover upon the declaration found on schedule "B 1." I prefer to discuss the effect of this in its various bearings under the head: 2d. Are the defendants *bona fide* purchasers for valuable consideration, and without notice? It is proved that they did. not have actual notice of what was written on schedule "B 1." Did they have constructive notice? Reason and justice demand that we look at this question not in the light of after developments, but from the standpoint occupied by the defendants when they purchased, paid the purchase price, and took conveyances to the land in controversy. And what would the records have disclosed to a prudent, careful, and diligent examiner of the title? He would have found that the 92½ acres of land, including the ferry, composed of several parcels, was conveyed by L. M. Shumaker and wife to E. F. Keen by deed dated December 17, 1862; that E. F. Keen and wife conveyed it to W. W.

Keen & Co., a firm composed of W. W. Keen and James M. Walker, by deed dated January 23, 1865; that W. W. Keen conveyed to James M. Walker his interest in three pieces of property owned by W. W. Keen & Co., for the consideration of $9,000, by deed dated November 15, 1865; and that Walker conveyed to Keen his interest in two parcels of land owned by said firm for the aggregate consideration of $10,000, Walker's half interest in the whole of the property in controversy being conveyed by deed bearing date November 15, 1865, reciting a consideration of $5,000, and that its purpose was to vest in Keen the entire title to that property which had before been jointly owned by him and Walker. There were five deeds from Walker to Keen, and each expressed on its face that the intention was to vest in Keen, as his individual property, the land which had been previously held by Keen and Walker as partners. In other words, they were nothing more or less than deeds of partition of the lands of W. W. Keen & Co. between the members of the firm. (In this connection it may be observed that this is not only a fair inference from the deeds themselves, but is proved by William Walker and virtually admitted by James M. Walker on cross-examination.) He would also have seen that these lands were heavily incumbered in the hands of E. F. Keen, W. W. Keen & Co., and W. W. Keen by judgments against E. F. Keen and W. W. Keen. He would have discovered the deed of March 13, 1868, from W. W. Keen to William C. Banks and Charles L. Powell, his trustees in bankruptcy, and that the land had been ordered to be sold by the bankrupt court to discharge the liens upon it. The record title was in all respects regular and perfect. The property appeared to be Keen's individually and in fee, and properly surrendered by him in bankruptcy, and regularly sold to pay incumbrances. Could he reasonably have been required to investigate further? The deed to the trustee is general in its terms, conveying "all his estate and effects," giving no particular description of the property embraced, and referring to

no other paper for a description. But the contention is that the deed from Keen and wife to the trustees of June 1, 1869, did refer to the lands "which were listed and surrendered by the said Keen in his schedules in bankruptcy, where a more particular description thereof will be found," and that the defendants were by this deed directed where to go for information about Keen's property. But the whole title, by operation of law and the first deed, had passed out of Keen, and, had the second deed undertaken to carry title, it would have been inoperative. *Evans* v. *Spurgin,* 6 Gratt., 118. But the second paper was in no proper sense a deed conveying Keen's property. He merely joined to make effectual his wife's relinquishment of her contingent right of dower; and, besides, there is nothing in the language employed, had the deed fallen under the eye of the examiner, to have led him to suspect that the schedules would make any disclosure as to title other than what the records, of which we suppose him to have been apprised, showed, but merely a "more particular description" of the property would have been found. So far from exciting suspicion, had any existed, the deed would have tended to allay it, for it was fair to presume it had reference to property belonging to Keen, and of which his wife would be dowable in the event of her surviving him, and not to trust property, in which neither was interested. If the declaration of Keen in schedule "B 1" is true, the land ought not to have been surrendered by him in bankruptcy, the assignees or trustees had no more right to it than if it had been an express trust declared in the most formal manner by deed or other written instrument, and it would have been no act of bankruptcy for Keen to have conveyed the legal title to the owners of the equitable estate. Section 5053, U. S. Rev. Stat. provides: "No property held by the bankrupt in trust shall pass by the assignment," and *Id.*, section 5016, provides what does pass, and what the inventory or schedules shall contain: "The said inventory must contain an accurate statement of all the peti-

tioners' estate, both real and personal, assignable under this title, describing the same and stating where it is situated, and whether there are any, and if so, what incumbrances thereon." Surely, then, this was no place for one to look to find, not only what was not required to be there, but what ought not to have been there.

The records had shown the purchaser that the property was Keen's, and how unreasonable and dangerous would be a rule that required an examiner to search for latent, hidden equities not in his line of title, and not in the proper receptacle for them, but when the law had solemnly declared they should not be, to falsify and nullify the record title. A purchaser cannot be deemed negligent for omitting to look for that which he cannot reasonably expect to find. *Le Neve* v. *Le Neve*, 2 W. & N. L. C., 121, 205; *Mott* v. *Clark*, 9 Barr, 400; *Siter, Price & Co.* v. *McClanachan*, 2 Gratt., 312, 313, and cases cited by defendant's counsel. While it is true, as has been stated, the decrees and orders of the bankrupt court did not *per se* constitute a bar to complainants' claim, as they were not parties, it is equally true that said court did have jurisdiction *sub modo* of the subject-matter of these suits. The legal title to it was in the bankrupt, and he embraced it in his inventory. If it was trust property, and had been legally made so to appear, the court would have had no jurisdiction, but the mere unsupported claim that it was trust property surely could not have had the effect of ousting the court of jurisdiction.

Suppose the lien creditors of a party indebted to insolvency were to file a bill to subject his real estate to the payment of their liens, and he were to set up affirmatively in his answer that while it was true he had contracted the debts upon which the judgments were based on the faith of the land, to which he had the legal title, and had possessed, used, and enjoyed it under said title as his own, nevertheless there was a secret, resulting trust in him for the benefit of his wife and children, or grand-children, if you please, and later on, in the same proceedings,

he and the attorney, who prepared the answer were to admit that the statement was untrue, or did some act so totally inconsistent with its truth as to be tantamount to an admission that it was false, can it be believed that a court of equity would stay proceedings till the wife and children or grandchildren could be brought in by amendment and afforded an opportunity to prove a resulting trust in the land? And if the court were to proceed and sell the land to purchasers without notice of the unproved and subsequently falsified affirmative allegation of the answer, and confirmed the sale, collected the money, applied it in discharge of liens upon the land, and had title conveyed to the purchasers, could it be contended that the court would be ousted of jurisdiction, and its decrees be nullities? Surely the position could not be maintained, and yet the case put is the case under judgment stated differently. Let us suppose a case suggested by one of defendant's counsel, that the bankrupt had declared that all the property surrendered by him was bought with funds belonging to his wife, could it be seriously contended that the mere assertion of such a fact, wholly unsupported, would have divested the court of jurisdiction? It would seem plain that the court was not wholly without jurisdiction, as is contended, nor do I believe there was any obligation upon it to stay its hand by reason of the declaration made on Schedule " B 1." More particularly when it is borne in mind that Keen himself repudiated the statement, and made the property the basis of a claim for the settlement of valuable property upon his wife in consideration of her relinquishment of her contingent right of dower, and when counsel, who dictated the so-called declaration of trust, signed a consent decree for the sale of the land embraced in it to pay liens upon it. With what propriety could a court be asked or expected to give credence to a declaration thus discredited by client and counsel? As I understand the rule, declarations to be admissible must have been made when the party had no interest to make them. And surely this cannot

be predicated of Keen's declaration, made in favor of his grandchildren against his creditors, when he was not only insolvent, but in bankruptcy. *Ross* v. *Bank of Benlingron*, 1 Aiken, 43; 15 Amer. Dec., 664; 1 Cowen & Hill's Notes to Phil. on Evidence, 644–5; *Padjett* v. *Lawrence*, 10 Paige Ch. R., 170; 40 Amer. Dec., 232; *Carpenter* v. *Hallister*, 13 Lmt., 552; 37 Amer. Dec., 612. It would be carrying the doctrine of the admissibility of declarations against title to a dangerous length to hold that of Keen admissible under the circumstance of this case. To do so, and maintain that it is sufficient to establish the truth of it and impress a trust upon property, would be to hold that every insolvent, unscrupulous debtor could shield his property from creditors simply by declaring a trust in favor of his family. It is believed that no respectable authority can be found to support a rule so unreasonable and so fraught with mischief. All that can be said of the proceedings and decrees of the district court is, that while not *per se* binding on complainants, because not parties, the court did acquire jurisdiction of the subject-matter of controversy, and passed the title to it to *bona fide* purchasers for value and without notice, actual or constructive, before their claim, if any they had, was properly and legally made to appear.

This opinion has been extended far beyond the limits of what was either intended or desired, but an apology will be found in the voluminousness of the record and the variety of questions involved. I am gratified that the law and evidence in the case are, in my judgment, in consonance with justice and equity. A decree will be prepared dismissing both bills with costs to the defendants.

DECREE AFFIRMED.